

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

FILED

SEP 0 5 2024

Clerk, U.S. District Court
Eastern District of Texas

|  | § |  |
|---|---|---|
| **LOUIE COMELLA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **NEWTEKONE,INC.,** | § | CIVIL CAUSE NO. 4:24cv 813 SDJ/AGD |
| **NEWTEK SMALL BUSINESS FINANCE, LLC;** | § | |
| **NEWTEK CONVENTIONAL LENDING, LLC;** | § | **Verified Complaint** |
| **NEWTEK SMALL BUSINESS FINANCE,INC.;** | § | |
| **NEWTEK BUSINESS LENDING, LLC;** | § | |
| **SMALL BUSINESS LENDING, LLC** | § | |
| **NEWTEK BANK, N.A.; BARRY SLOANE;** | § | |
| **SCOTT SHULMAN; ARNALDO FEBLES;** | § | |
| **AUSTIN BRIGGS; DANIEL PAZ; DANIEL F.** | § | |
| **WILLIAMS; DAN ESHBAUGH** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

NOW COMES Louie Comella (the "Plaintiff"), and files this Original Complaint for

common law, and state law claims, and for civil violations of the Racketeer Influenced and

Corrupt Organizations Act (18 U.S.C. §§ 1964 (c) and (d)) ("RICO"), fraud, and civil

conspiracy to commit fraud against (i) NewtekOne, Inc.; (ii) Newtek Small Business Finance,

LLC; (iii) Newtek Conventional Lending, LLC; (iv) Newtek Small Business Finance, Inc.; (v)

Newtek Business Lending, LLC; (vi) Newtek Bank, N.A.; (vii) Small Business Lending, LLC

(viii) Barry Sloane; (ix) Scott Shulman;  (x) Arnaldo Febles; (xi) Austin Briggs; (xii) Daniel

Paz; (xiii) Daniel F. Williams; and (xiv) Dan Eshbaugh; (collectively, parties (i) through (xiv)

represent the "Defendants"). Predicate acts giving rise to the RICO claims include (i) mail

fraud in violation of 18 U.S.C. § 1341; and (ii) wire fraud in violation of 18 U.S.C. § 1343; In

support thereof, Plaintiff states as follows:

## I. PRELIMINARY STATEMENT

1. This Complaint involves a Ponzi-like scheme, whereby Defendants have engaged in conspiracy to defraud Plaintiff by manufacturing fake loan defaults causing injury to the Plaintiff, his property, and his business, while at the same time attempting to defraud a government agency, the Small Business Administration ("SBA"), at the unnecessary expense of the United States taxpayers.

2. Defendant Newtek is a national lender with a history of manipulating loans through subsidiary companies and  leaving behind a trail of disgruntled borrowers. In 2021, a federal jury convicted five former officers and employees of a wholly owned subsidiary of Newtek, in a conspiracy to defraud the United States government and other financial institutions in connection with improperly obtained U.S. Small Business Administration ("SBA") loans and guarantees.

3. Plaintiff would show at trial that the fraud committed by Defendants as alleged herein is systematic and has become way of doing business for the Defendants. The instant Complaint involves a 5-year pattern of fraud and racketeering by Defendants against Plaintiff, and others, by way of an intricate web of deceptive and negligent lending practices, orchestrated by the Defendants, which for Plaintiff herein began in 2019 with Defendants' fraudulent misrepresentations on deficient loans, and has culminated into this 2024 Complaint. Defendants are now attempting to fraudulently foreclose on two of Plaintiff's properties, and further injure his business.

4. In December 2022 Newtek refused to accept over $2,100,000.00 on two of its own payoff letters on two separate SBA 7a loans. In January 2023, Newtek again refused to accept its own payoff letter on an $816,000.00 SBA 7a loan.  In reliance on Newtek's payoff letter,

funds were wired to escrow from an FDIC insured bank to pay off the $816,000.00 SBA 7a loan. Newtek directed and caused a closing to occur in which title was transferred and recorded in public records on January 11, 2023. Despite Plaintiff's performance on Newtek's own payoff letter, Newtek refused to accept the SBA 7a loan payoff for a third time.

5. In a RICO predicate act, Defendants through wire fraud attempted and conspired to cover up Newtek's written statements that it would release liens and other communications involving the SBA 7a payoffs by recalling emails intended to destroy and conceal documents related to the government agency loan program. These actions were brought to the attention of Newtek's management in January 2023 while $816,000.00 in payoff funds sat in escrow to close and pay off the SBA 7a loan. Instead of accepting the payoff, Newtek ceased responding to communications and manufactured fake loan defaults on Plaintiff's perfect payment history and have since proceeded on a disparaging course to defraud Plaintiff by attempting to deprive him of his property, injure his business, and obtain fraudulent SBA guarantees on the SBA 7a loans Plaintiff showed up three times to payoff.

6. In the latest RICO predicate act, Newtek is attempting to fraudulently foreclosure on Plaintiff's business property to intentionally injure Plaintiff and circumvent related litigation pending in this District. Defendants' actions in the pending foreclosure process cannot change the prima facie evidence recorded in the public records on January 11, 2023, where the title and deed transfer which Newtek approved but refused payment on, occurred. The public records also confirm that Defendants are attempting to foreclose on the wrong titled party and now exposes the transaction they attempted to cover up by wire fraud as alleged herein.

7. Plaintiff understands no private right of action exists for violations of the Small Business Act or agency regulations by Defendants as alleged herein. Plaintiff is also aware; it

is well settled that a person, company, entity, enterprise, or others violating United States Government statutes and regulations inclusive of crimes involving Major Fraud against the United States government, or actions against the public interest, do not automatically give rise to a civil cause of action by an individual such as the Plaintiff herein claiming to have been injured from a violation thereof.

8. Plaintiff does assert he has legal standing to bring civil claims arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Defendants. Plaintiff and his business as alleged herein have suffered injury which was caused by the Defendants' commission of one or more of the predicate acts defined by 18 U.S.C. §1961(1). Plaintiff asserts he was the intended target of the Defendants' conduct involving a government agency loan program, whereby the Plaintiff, his property and his business were injured, and the injury sustained occurred by reason of the Defendants' substantive RICO violations which were foreseeable by Defendants, concrete in nature, and not subject to speculation.

## II. JURISDICTION AND VENUE

9. This Court has original federal jurisdiction over this civil action under 28 U.S.C. § 1331 because Plaintiff brings claims arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, in that the claims arise under the laws of the United States.

10. The Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." Plaintiff seeks recovery for injuries to business or property caused by violations of RICO (18

U.S.C. §§ 1961, et seq.); he suffered "economic injur[ies]" that as described infra, are "concrete and particular and not speculative."

11. This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367. The Plaintiff's state law claims are so related to his claims under RICO (18 U.S.C. §§ 1961, et seq) that they form part of the same case or controversy.

12. Additionally, this Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332 because the matter in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs and is between citizens of different States.

13. This Court also has jurisdiction over this action under 28 U.S.C. § 1337(a) because it is a civil action involving a federal question related to commerce and a federal agency loan program.

14. This Court has personal jurisdiction over Defendants because they conduct business in the State of Texas, have purposefully availed themselves of the privileges of conducting business in Texas, and have sufficient minimum contacts with Texas such that the exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965(a) and (b), because a substantial number of the acts and transactions that precipitated Plaintiff's claims occurred within this District.

16. Defendants did (or solicited) business, and transmitted communications by mail or wire, relating to their illegal scheme, in this district; transacted their affairs, in this judicial district; and committed wrongful acts in this district, which have directly impacted the general public (of this district), and the ends of justice do require that parties residing in other districts be brought before this Court.

17. Along with the acts alleged in this Complaint, the Defendants directly or indirectly used the means and instrumentalities of interstate commerce and the United States mail. Defendants operated an enterprise within the meaning of 18 U.S.C. §1961(4) that operates in interstate commerce and the activities of which affect interstate commerce.

18. Venue is proper in this District as there is litigation pending in this District under Case No: 4:24-CV-00264-SDJ directly related to an Adversary  Proceeding No. 23-4050 for claims in a Confirmed Chapter 11 Bankruptcy Plan filed in this District under Case No: 23-41109-11, which involve related interests and business property of Plaintiff.

### III. THE PARTIES

19. Plaintiff Louie Comella ( "Plaintiff" and/or "Comella") is an individual and resident of Texas and Nevada who's address for mailing is PO Box 570950, Dallas, Texas 75357. Plaintiff Louie Comella individually and through his business owns, operates, licenses, and produces media content for broadcast, and entertainment including film, radio, TV, and OTT.

20.  Each of the Defendants in this Complaint are also a "person" within the meaning of RICO which "includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

21. At all times relevant to this Complaint, all Defendants constituted an association-in-fact enterprise, ( "enterprise" or "the RICO enterprise" or "Newtek"), as defined by 18 U.S.C. § 1961(4). The Defendants together form an association-in-fact (along with being separate legal enterprises) for the common and continuing purpose of engaging in schemes to defraud others, including Plaintiff, the SBA, and others with which the enterprise has dealt and deals with, among other things; manufacturing fraudulent loan defaults to collect SBA loan guarantees, manipulation of federally guaranteed loans to influence stock prices to the

detriment of Plaintiff and others, extorting and defrauding Plaintiff and others, by failing to accept SBA guaranteed loan payoffs, and other acts as complained of herein. This constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4). The members of the enterprise functioned and continue to function as a continuing unit with an ascertainable structure separate and distinct from that of the culpable individuals.

22. The following Defendants named herein containing the word "Newtek" are confusingly similar in their dealings with Plaintiff. Newtek's website(s), emails, and letter communications generally refer to "Newtek" generally, but seldom, if ever, is there a single identifiable "Newtek". The line between Newtek entities is substantially blurred to the point that it is difficult to determine. Moreover, there is no clear demarcation of what or which Newtek entity is doing what but there is an association between all Newtek entities named as Defendants herein that cannot be separated, as all acted without corporate formality when communicating with the Plaintiff. Defendants NewtekOne, Inc., Newtek Small Business Finance, LLC, Newtek Conventional Lending, LLC, Newtek Business Lending, LLC, Newtek Bank, N.A., Small Business Lending, LLC, Newtek Small Business Finance, Inc., are hereinafter referred to as "Newtek" and/or the "Newtek Defendants".

23. The "Newtek" Defendants, NewtekOne, Inc., Newtek Small Business Finance, LLC, Newtek Conventional Lending, LLC, Newtek Business Lending, LLC, Newtek Bank, N.A., Small Business Lending, LLC, Newtek Small Business Finance, Inc., tend to operate as a single business enterprise making small business loans, providing SBA 7a and 504 loan financing, business services, bank loans, and business loans. As a single business enterprise, each of these Newtek entities has integrated resources and operations to achieve a common business purpose. As a single business enterprise, each company shares common officers,

common name, centralized management, shared accounting, common offices, shared offices, common employees, shared employees, singular and shared allocation of profits and losses between each enterprise. As a single business enterprise, the Newtek entities have participated, directed, approved, authorized, ratified, operated, conducted, facilitated, enabled, contributed to, and encouraged the conduct complained of herein.

24. Defendant NewtekOne, Inc., formerly known as Newtek Business Services Corp. is a publicly traded Florida corporation that may be served process at its agent for process at 4800 T Rex Ave STE 120, Boca Raton, FL 33431-4479. This entity manages, directs, and holds the other entities but also engages, influences, enables, manipulates, conducts, and/or has allowed the fraudulent conduct and racketeering activities to occur as set forth herein.

25. Defendant Newtek Small Business Finance, LLC is a New York limited liability company with its principal place of business at 1981 Marcus Avenue, Suite 130, Lake Success, New York. Defendant may be served with process through its registered agent, Corporation Service Company, at 80 State Street, Albany, New York 12207. This entity exists as a mere tool and business conduit front, for purposes of carrying out fraud and many of the racketeering activities outlined in this Complaint.

26. Defendant Newtek Business Lending, LLC is a Florida limited liability company which may be served with process through its registered agent for service Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.  This Defendant is another front operation, entity for purposes of carrying out the racketeering activities outlined in this Complaint,  which amongst other claims in the instant action includes the issuance of a knowingly fraudulent loan commitment it could not have delivered on.

27. Defendant Newtek Bank, N.A. is a federally chartered Office of the Comptroller of

the Currency (OCC) regulated Florida based bank which may be served with process through its registered agent for service at 4800 T Rex Ave STE 120, Boca Raton, FL 33431 or at its offices at 1111 Brickell Ave, Suite 135, Miami, Florida, 33131. This Defendant was previously known as National Bank of New York City, and a 59-year-old national bank regulated by the OCC. Although this Defendant operated for decades as a legitimate enterprise before Newtek took control, it is now upon information and belief a RICO enterprise investment used for purposes of legitimizing other racketeering activities. This Defendant was used by other Defendants and enterprise associates to solicit a loan to Plaintiff through its officers and agents before the bank was even federally authorized to do so. Its officers and agents also used this Defendant to issue fraudulent SBA 7a loan defaults as alleged below.

28. Small Business Lending, LLC is believed to be a subsidiary entity of Newtek Bank, N.A. solely in the context of legal entity formation, and may be served process at its address 1981 Marcus Avenue – Suite 130, Lake Success New York 11042. This Defendant is really another disregarded entity tool to manipulate loans, financial reportd, and further the schemes of the RICO enterprise.  This Defendant's representatives used this subsidiary entity of Newtek Bank, N.A. to issue fraudulent SBA 7a loan defaults as alleged below.

29. Defendant Newtek Conventional Lending, LLC is a Delaware limited liability company which may be served with process at its offices at 1209 Orange Street, Wilmington, DE 19801.  This Defendant is another scam and/or sham entity used for purposes of carrying out the racketeering activities outlined in this Complaint, which includes the issuance of a loan commitment it could not have delivered on.

30. Defendant Barry Sloane (sometimes referenced as "Sloane") is an individual, and NewtekOne, Inc.'s President, Chairman and Chief Executive Officer. Upon information and

belief, Sloane, is also Newtek's largest shareholder. At all relevant times, Sloane resides in the State of New York. He may be served at his principal place of business at 1981 Marcus Avenue, Suite 130, Lake Success, New York, or wherever he may be found. Sloane oversees Newtek and the other Defendants. In the instant Complaint, Sloane was informed of the foreseeable consequences, damages, and injury to Plaintiff and his business that would directly result from the actions and/or nonactions of Sloane and Newtek. Despite written notice, Sloane failed to prevent imminent foreseeable injury to Plaintiff and his business by allowing the fraud, mail fraud, wire fraud, and other claims alleged herein to occur.

31. Defendant Arnaldo Febles (sometimes referenced as "Febles"), is a Portfolio Manager and a corporate officer for Newtek at all relevant times, and an individual residing in the State of New York. He may be served at his principal place of business at 1981 Marcus Avenue, Suite 130, Lake Success, New York, or wherever he may be found. Amongst other fraudulent acts, to be shown at trial, Febles made several misrepresentations that caused damages to Plaintiff, committed mail and wire fraud by attempting to destroy, conceal and coverup fraud, and conspired to manufacture fake SBA loan defaults to assist Newtek to collect fraudulent SBA guarantees at the expense of Plaintiff, and the United States government, which include injury to Plaintiff's property and his business.

32. Defendant Austin Briggs (sometimes referenced as "Briggs"), Assistant Vice President for Defendant Newtek at all relevant times, is an individual residing in the State of Florida. He may be served at his principal place of business at 4800 T-Rex Avenue, Suite 120, Boca Raton, Florida 33431 or wherever he may be found. Amongst other fraudulent acts to be shown at trial, Briggs wrongfully directed Plaintiff towards closing a $2.975 million dollar conventional loan that could not have been funded, yet assured Plaintiff of its certainty based

on Plaintiff's perfect payment history, assets, cash flow, and a business plan provided to Newtek, for which assurances caused Plaintiff to invest substantial amounts in anticipation of the loans. Briggs' actions were intended to extort money from Plaintiff by preventing Plaintiff from leaving Newtek and resulted in injury to Plaintiff's business.

33. Defendant Scott Shulman (sometimes referenced as "Shulman"), Managing Director for Newtek Bank, N.A. at all relevant times is an individual residing in the State of Florida. He may be served at his principal place of business at 4800 T Rex Avenue, Suite 120, Boca Raton, Florida 33431 or wherever he may be found. Amongst other fraudulent acts to be shown at trial, Shulman conspired to short Plaintiff $255,000.00 on two SBA 7a loans and failed to pay off a Comerica equipment loan causing injury to Plaintiff and his businesses. Shulman made and offered and misleading assurances to Plaintiff about Newtek's ability to provide financing through a bank loan from an upcoming FDIC insured bank acquisition which had not yet taken place. Shulman solicited a loan referral under SBA loan pretenses to shift to a bank loan after the bank's actual acquisition but failed to deliver on either while conspiring to default Plaintiff's SBA loans and collect SBA guarantees. Shulman's fraudulent conduct has damaged Plaintiff's property and his business.

34. Daniel Paz (sometimes referenced as "Paz"), a Vice President for Defendant Newtek at all relevant times, is an individual residing in the State of Florida.  He may be served at his principal place of business at 4800 T-Rex Avenue, Suite 120, Boca Raton, Florida 33431 or wherever he may be found. Paz fraudulently conspired to short Plaintiff $255,000.00 and failed to correctly payoff a Comerica loan which caused injury to the Plaintiff and his businesses.

35. Daniel F. Williams (sometimes referenced as "Williams"), an employee in the underwriting department of Defendant Newtek at all relevant times, is an individual believed

to be residing in the State of Florida. He may be served at his principal place of business at 4800 T-Rex Avenue, Suite 120, Boca Raton, Florida 33431 or wherever he may be found. Williams fraudulently represented in at least two recorded phone conversations that he could facilitate a $2.975 million-dollar conventional loan and then increased that loan to a $4.25MM for Plaintiff but had no ability to actually do so and fraudulently concealed such. Williams made several misrepresentations causing injury to the Plaintiff and his business.

36. Dan Eshbaugh (sometimes referenced as "Eshbaugh"), at all relevant times, is an individual residing in the State of Florida. He may be served at his principal place of business at 4800 T-Rex Avenue, Suite 120, Boca Raton, Florida 33431 or wherever he may be found. Eshbaugh in his capacity as a Senior Vice President of Commercial Lending for Newtek and Defendant Newtek Business Lending LLC, knowingly and willingly provided a $2.975 million-dollar fraudulent loan commitment for which Eshbaugh knew there was no known ability to provide such a loan and fraudulently concealed such causing injury to the Plaintiff and his business.

## IV. GENERAL ALLEGATIONS

37. This Complaint asserts claims under federal law, common law, and state law, and these claims arise out of the same controversy or sequence of events. This action is brought pursuant to 18 U.S.C. §§ 1961-1968 Racketeer Influenced and Corrupt Organizations - Civil RICO, by Plaintiff against Defendants for their unlawful, fraudulent conduct by engaging in a pattern of unlawful racketeering activity involving six (6) SBA 7a Loans. By and though their unlawful actions all Defendants engaged in multiple, repeated and systematic predicate acts of fraud, mail fraud and wire fraud, all the while knowing of, and agreeing to, the overall objective of the fraud - generating exorbitant compensation for the enterprise and for each person.

38. By and through their unlawful actions, therefore, all Defendants (i) conducted and/or participated in RICO predicate acts as complained of above and below (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired to violate 18 U.S.C. § 1962(c); (in violation of 18 U.S.C. §1962(d)), and defrauded Plaintiff, and others, in the process.

39. Defendants' engagement in repeated and systematic acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343 involving Plaintiff began on or around December 2019 and continue to the present day. The RICO predicate acts took place in Texas, California, Colorado, Washington, and elsewhere, whereby the Defendants engaged in, and affected interstate commerce through a pattern of racketeering activity consisting of the numerous acts as complained of herein.

40. Newtek originated six (6) SBA 7a loans totaling approximately $5,300,000.00 for Plaintiff and his business and for which Plaintiff maintained a perfect and timely payment history on the said loans. Newtek's negligent misrepresentations and initial RICO predicate acts against the Plaintiff as alleged herein started shortly before the closing of two SBA 7a loans in December 2019. Newtek fraudulently induced Plaintiff to enter into loans that were deficient and different than originally represented.

41. At a December 23, 2019, closing in the Denver Colorado, Newtek intentionally misrepresented the loan amounts at closing shorting Plaintiff $255,000.00, where Plaintiff was expecting $2,200,000.00.  At the same closing, Newtek paid off a wrong loan that was to be refinanced—a credit line, thereby closing it, and caused Plaintiff substantial expenses by making and then breaching a series of promises thereafter. Further, as later discovered, Newtek's misconduct caused Plaintiff other substantial damages when the lender that was supposed to be paid off on an equipment loan – Comerica Bank, N.A., filed suit which evolved

into a pending litigation judgment, exposing Plaintiff to over $300,000.00 and other damages to be shown at trial.

42. Also in 2019, The United States Department of Justice indicted five former officers and employees of Banc-Serv Partners LLP (Banc-Serv), a wholly owned subsidiary of Newtek acquired in 2016, for their million-dollar scheme to defraud the SBA. (See Exhibits A). In 2021, a federal jury convicted those five former officers and employees of the wholly owned Newtek subsidiary, in a 13-year conspiracy to defraud the Small Business Administration (SBA) in connection with its programs to guarantee loans made to small businesses.  In the Banc-Serv case, the five former officers and employees caused the submission of the reimbursement requests to the SBA to purchase defaulted loans from investors and lending institutions guaranteed by the SBA. (See Exhibits A).

42. Although the conspiracy to defraud the SBA may have existed before Newtek took complete control of the Banc-Serve subsidiary, Plaintiff would assert that the conduct and actions of the Defendants as alleged herein are coincidentally parallel of the conduct of the officers that defrauded the SBA in the Banc-Serv case in that Defendants herein are also attempting to fraudulently obtain SBA guarantees. Plaintiff would show herein and at trial that he attempted to pay off  SBA 7a loans on different occasions, but Newtek refused.  Instead of accepting $2,100,000.00 in December 2022 and $816,000.00 in January 2023, the Newtek Defendants manufactured fake loan defaults on Plaintiff's perfect payment history (See Exhibits B), so that the SBA would purchase the defaulted loan guarantees.

43. In July 2022, Defendants issued a $2,975,000.00 conventional loan commitment to Plaintiff, which Plaintiff, and several others relied on as part of a $4,500,000.00 and later a $6,000,000.00 acquisition. Defendants concealed the fact that the loan commitment was

fraudulent at the time it was provided. After, Defendants took six months to decline the $2,975,000.00 conventional loan Newtek induced Plaintiff to pursue, it was later discovered that Newtek, according to their own SEC filings, did not have the ability to make the loan. The fact that the conventional loan could not have taken place is further confirmed by Newtek's litigation attorney Bruce Zabarauskas of Holland & Knight LLP who states in a July 28, 2023, letter to be shown at trail,  "Newtek Conventional Lending LLC had ceased making new loans in 2020.  This also was discoverable through a reasonable online search because this fact was disclosed in the 2022 Form 10-K for NewtekOne, Inc. (which was then known as Newtek Business Service Corp.)"

44. In December 2022 Newtek refused to accept over $2,100,000.00 on two of its own payoff letters on two separate SBA 7a loans. In January 2023, Newtek also refused to accept $816,000.00 on its own payoff letter on an SBA 7a loan.  Over $816,000.00 was wired to escrow to pay off the SBA 7a loan at Newtek's request, directive, payoff letter, and instruction a second time. As evidenced in documents available in public records to be provided at trail, an actual closing occurred in which title was transferred and recorded at the direction of Newtek, but Newtek refused to accept the $816,000.00 payoff. Thereafter, Newtek changed the terms of their own payoffs a fourth time and refused to release the liens as they previously represented, in writing several times. Through fraud, wire fraud and mail fraud as alleged herein, and to be shown at trail have attempted to cover it up.

45. On November 29, 2022, Newtek provided written payoff letters to Plaintiff, wire instructions, and detailed confirmations by telephone and email to multiple parties that clearly and concisely reflect "all assets pledged as collateral will be released within 45 days of receipt of payoff funds". (see Exhibit C).  Plaintiff arranged refinancing on two of the properties in

the amount of $2,100,000.00 to close before December 31, 2022. On or around the day of closing on December 27, 2022, Newtek by way of Defendant Febles contacted Plaintiff and stated Newtek would not be closing on their own $2,100,000.00 payoffs thereby breaching their own agreements.

46. On January 2, 2023, Newtek changed course again and decided to accept their own $2,100,000.00 payoffs, however Plaintiff had lost the $1,300,000.00 refinance lender due to Newtek's December 27, 2022, breach; but Plaintiff was still able to arrange for payoff on the $816,000.00 loan.

47. Newtek provided multiple communications and instructions to Plaintiff, the escrow company, title, and the new lender that a closing would take place. The funds as requested by Newtek, were wired to escrow from an FDIC insured bank, and closing documents were executed by the Plaintiff as per Newtek's instructions. The real property title was then transferred, conveyed, and recorded into the Riverside County California records where to date and to wit reflect the transaction took place.  However, despite all the express communications from Newtek and its officers, the execution of closing documents, the title transfer, and money wired to escrow, Newtek once again refused to accept the funds and breached their own payoff agreement by refusing to release liens or accept payment they requested.

48. After Newtek refused to accept the third SBA 7a loan payoff, Plaintiff received a call from Defendant Arnaldo Febles on February 1, 2023, who called from a blocked number and stated, "we're going to liquidate you and collect on all your loans now," and hung up. On February 2, 2023, Plaintiff received an email from Defendant Small Business Lending, LLC a subsidiary of Newtek Bank, N.A. and Defendant Febles with the manufactured loan defaults stating, "Please note the accounts listed above are 32 days past due". This 32-day default was

while $816,000.00 was in escrow for Newtek pursuant on their own payoff they breached. There was another $350,000.00 available to Plaintiff, and which was also known by Newtek since December but Newtek deprived Plaintiff of access to those funds as well. Plaintiff suddenly found himself a victim in a larger racketeering scheme operated by CEO Barry Sloane, Scott Shulman, Arnaldo Febles, and several other enterprise associates to extort, defraud, and steal from Plaintiff, and others, at the expense and injury to Plaintiff's business.

49. At present, Plaintiff contends that Newtek is pursing SBA guarantees to have the United States taxpayers who fund the SBA pay for Newtek's refusal to accept Plaintiffs payoffs on Newtek's own payoff letters. In simpler terms, Newtek refused $2,100,000.00 of Plaintiff's money on three occasions and now Newtek wants taxpayers to fund their fraud. The Newtek Defendants' reckless behavior and negligent practices as alleged herein have caused considerable financial and reputational damage to Plaintiff, resulting in over 8million dollars of injuries to Plaintiff and his business to be shown at trial. The Newtek Defendants' fraudulent actions were not mere oversights or misjudgments, but deliberate decisions that were made with the clear and concise understanding of their potential negative impact and were done for the pecuniary gain of the Defendants and the enterprise.

50. The pattern of racketeering engaged in by the Defendants involve schemes to defraud, extort, and steal from Plaintiff and others, for which in Plaintiff's claims herein, began on or before December 23, 2019, and continue to the present day. As of the filing of this Compliant, Newtek is attempting to fraudulently foreclosure on two of Plaintiff's business properties in furtherance of their scheme to defraud the Plaintiff, so that the SBA will pay guarantees. Defendants as alleged herein have caused significant harm to the Plaintiff amounting to fraud, wire fraud, and mail fraud, and conspired to commit wire and mail fraud, indictable and

actionable under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Defendants knowingly attempted to falsify records relating to the Plaintiff's SBA 7a loans and recalled and attempted to recall several emails to conceal and cover up documents. The Defendants breached their duty of good faith and fair dealing owed to Plaintiff, conspired, and committed fraud of different types and species, for which they were, are, and continue to benefit and unjustly enriched.

51. Plaintiff would allege that Newtek's Pattern of misrepresentations, fraudulent conduct, and deceptive business practices seem to be a way of doing business, as Plaintiff's claims against Defendants are not entirely unique to Plaintiff's own experiences. Prior to filing the instant Complaint, Plaintiff's due diligence considered the conduct of the Defendants over the course of five (5) years on six (6) loans which include over 1000 emails, phone calls, and communications. In retrospect, Plaintiff would assert there was a problem with every loan. As a publicly traded company with all types of regulatory compliance requirements from the SBA, to the SEC, and now with a bank, there is the OCC and FDIC; yet according to the numerous accounts of readily available public information as demonstrated as follows, Newtek has operated recklessly at the expense of borrowers, taxpayers, shareholders, the general public, and the Plaintiff herein.

52. To see if others had similar experiences with Newtek, Plaintiff entered the word "Newtek reviews" into the search engine Google. The "Newtek reviews" search retuned hundreds of negative online reviews from reputable websites such as Best Company, Yelp, Trustpilot, Reddit and others, with few, if any positive ones.  Newtek has an impressive collection of bad reviews online, and for which Plaintiff could not find any other lender with a worse overall rating on all sites combined than Newtek. ( See Exhibit K). Another result in

Plaintiff's search for "Newtek Reviews" revealed an independent review of Newtek titled, Newtek Business Services (NEWT): A House of Cards: Atrocious Credit, Manufactured Earnings, Fictional Net Asset Value and Regulatory Peril. The sixty-six (66) page research document is an independent view on Newtek's financial condition and business practices at the time. ( See Exhibit L).

53. Plaintiff's search results also reflected several press releases by the United States Department of Justice on the conviction of 5 officers and employees of a Newtek subsidiary convicted of defrauding the SBA guarantees. ( See Exhibit A). The search rendered numerous SEC public filing results. Plaintiff pressed a random link and looked up one of Plaintiff's loans referenced herein that he was forced by to sell by Newtek at a significant loss. Newtek's own SEC public filings contain at least six (6) deficiencies on that loan. Newtek duplicated the same loan or used Plaintiff's address on six (6) different loans that have absolutely nothing to do with Plaintiff. ( See Exhibit M).

## V. FACTUAL BACKGROUND

54. Plaintiff Louie Comella individually and through his business owns, operates, licenses, and produces media content for broadcast, and entertainment including film, radio, TV, and OTT. Plaintiff entered into a series of six different SBA 7a loans with Newtek to support part of the growth of his media business as well as a food and beverage company that operated before the Covid19 Pandemic. Plaintiff is a direct SBA borrower as well as a guarantor to the Newtek SBA 7a loans.

55. In June 2022, Plaintiff had an opportunity to acquire a major market television station in Houston, Texas ("KVVV"). Newtek encouraged and induced Plaintiff along with two of his companies to apply for a conventional loan with full knowledge and understanding that it was

to assist with the purchase of KVVV.

56. Newtek was provided the financial projections during an unreasonably delayed underwriting process that took over six months. During the conventional loan application process Newtek representatives repeatedly assured the Plaintiff that the loan would be approved despite the unreasonably delayed underwriting process. Ultimately, the loan was not approved because Newtek, according to their own SEC public filings, never had the capacity to close or fund the conventional loan due to an ongoing bank merger that created Newtek Bank, N.A. during that time frame.

57. The fact that Newtek could not make a conventional loan at the time was only discovered after Newtek refused to accept $2,100,000.00 of its own SBA 7a loan payoffs. According to Newtek's compliance reporting as required by the Security and Exchange Commission ("SEC"), Newtek had ceased conventional non-conforming lending in 2020 and had not yet restarted a similar joint venture until months after the Plaintiff had applied for a loan and was assured it would be approved.

58. Once the conventional loan was denied, Plaintiff attempted to take out part of the Newtek debt so that he could refinance two of the existing SBA 7a loans with conventional loans to salvage the failed TV station acquisition directly and proximately caused by Newtek's delays and to payoff other SBA loans. Plaintiff secured third party financing in November and December 2022, which was slated to close by year end. Newtek supplied payoff letters for these loans on November 29, 2022, and represented that all liens, including those cross-collateralizing other loans that were not going to be paid off, would be released so that the new third-party lenders would be in a first lien position.

59. Just before closing on December 27, 2022, Newtek reversed course and indicated that

liens would not be released and would not close. Newtek's failure to release the liens evolved into the potential rescue financing and prevented Plaintiff from proceeding with the KVVV acquisition. The foregoing misconduct raises serious and valid claims for breach of contract, fraud, breach of the duty of good faith and fair dealing, fraudulent and negligent misrepresentations, and detrimental reliance.

60. Plaintiff alleges that Newtek solicited his loan application with no intention of ever performing on the loan and could not have performed according to Newtek's own SEC filings, which caused an unnecessary and unreasonable six-month delay in Plaintiff being able to secure alternative financing to pursue the KVVV TV acquisition. The purpose of the delay was part of an extortive scheme to keep Plaintiff paying interest.

## A. NEWTEK INDUCES PLAINTIFF TO APPLY FOR A CONVENTIONAL LOAN THAT IT HAD NO INTENTION OF EVER FUNDING AND/OR COULD NOT HAVE FUNDED.

61. Plaintiff and his business entered into a series of six SBA 7a loans with Newtek. Plaintiff is the primary responsible party subject to the five-million-dollar cap to a single borrower, as outlined in the SBA 7a program, and Plaintiff is also listed as a guarantor that pledged collateral on *all* of the loans. The loan agreements with Newtek were as follows:

        a.      December 23, 2019, Loan #XXXX606 for $1,335,000;

        b.      December 23, 2019, Loan #XXXX026 for $600,000 (paid off early);

        c.      March 6, 2020, Loan #XXXX078 for $265,000;

        d.      January 11, 2021, Loan #XXXX6944 for $980,312;

        e.      July 23, 2021, Loan #XXXX263 for $800,000; and

        f.      May 31, 2022, Loan #XXXX223 for $1,331,000.

62. Each of the foregoing loans was a Section 7(a) Small Business Administration Loan and each was secured by real property and other assets in Texas, and California. Newtek also cross-

collateralized each loan with its other loans and their subject collateral. Again, the Plaintiff acted as a guarantor on each of the loans on his business property and is the primary responsible party subject to the $5,000,000.00 cap to a single SBA borrower.

63. On the day of closing the last SBA 7a loan #XXXX223 for $1,331,000.00 in Dallas on May 31, 2022, Plaintiff learned of a TV station ("KVVV") for sale in Houston, Texas for $1.7MM. Although the May 31, 2022, loan had literally just closed, Plaintiff informed Defendant Febles of Newtek of this potential acquisition and was told by Febles that Plaintiff could use the Newtek loan proceeds in any manner so long as the proceeds were used in the same business industry. The cost of the KVVV station was $1.7MM, so additional funds would be needed for equipment, a facility, and engineering to make the KVVV acquisition. Plaintiff was aware that the maximum SBA 7a loan amount to a single borrower was capped at $5MM so Plaintiff immediately began to look outside of Newtek for funding and began to pursue the loan process with a number of different lenders some of which sought to refinance all of the loans including those with Newtek.

64. While making the monthly SBA 7a loan payments by telephone with  Defendant Febles, Plaintiff communicated the acquisition situation and expressed he was pursuing conventional and private lending sources to acquire KVVV, which included options to pay off all of Plaintiff's loans with Newtek. Febles stated he had an easier solution. More specifically, Febles told Plaintiff, "You don't need to go anywhere else for that, we can do the deal for you, right here in house it's not a problem," adding "you just closed so everything's fresh it's nearly a sure thing". Febles represented to Plaintiff that Newtek was offering a new conventional loan product that would fit perfectly with Plaintiff's needs and that the loan process was not nearly as arduous as the SBA program, and it would be no problem in securing additional financing. Febles told Plaintiff "It can happen fast, maybe two three weeks, **no need to take your loans away**", and

again reiterated to Plaintiff, "We can get this done for you, it's not a problem, we got this", adding further "you've been here a while, you're a payer; it's perfect, I'll put in a referral." From that point on Plaintiff ceased pursing other funding sources to acquire the KVVV TV station, equipment, and real estate needed to effectuate the acquisition.

65. Plaintiff had regular communications with Febles, a portfolio manager and an "officer" of Newtek, whose position was considered by Plaintiff to be in a fiduciary capacity.  Plaintiff trusted Febles with FDIC insured banking information to process tens of thousands of dollars of monthly wire and ACH payments on the $5,000,000.00 of SBA 7a loans. Plaintiff reasonably and justifiably relied upon the representations made by Febles that Newtek could and would provide a conventional loan. By virtue of their longstanding business relationship over the course of 6 different SBA 7a loans, Plaintiff trusted and relied on Newtek and Febles' representation to procure a conventional loan for Plaintiff's acquisition of KVVV.

66. On July 21, 2022, Newtek Conventional Lending provided a commitment letter for a $2.975 million dollar loan to Plaintiff Louie Comella, and two of his businesses, Big Brand Management Ltd. Co., and 512 E 11th Street, LLC. (See Exhibit D). The commitment letter represents to be from Newtek Conventional Lending and even references "Newtek Conventional Lending" as using a secure lending portal for each individual borrower. The letterhead also reflects, "Newtek Conventional Lending," For example:



981 Marcus Avenue
Suite 130
Lake Success, NY 11042
(212) 273-8100 |
www.newtekone.com

July 21, 2022                                    **Newtek Referral ID #        2075281**

Louie Comella
Big Brand Management LTD. Co.
512 E. 11th Street, LLC
Houston, Texas 77008

67. This letter repeatedly refers to only "Newtek" without distinction between any Newtek entities. Within the body of the letter, Newtek references at least three separate Newtek entities that could possibly be involved in the relationship with no clear demarcation of who is the proposed lender. This commitment letter or "preliminary consideration" letter is commercially unreasonable and vague but was nevertheless justifiably relied upon given the circumstances and context the Plaintiff was operating under at the time, and the contemporaneous oral communications between the parties. Defendant Briggs told Plaintiff he could provide the commitment letter to the KVVV station owner, the Dallas real estate seller, and others as needed because the loan was going to be funded.

It should be emphasized that this is not intended to be, nor should it be construed as a commitment by Newtek Conventional Lending to provide financing but serves as the preliminary consideration until further review and analysis has been completed.

Additionally, I would like to take the opportunity to introduce other Newtek services that could prove valuable to your business. Please note that your loan approval is in no way contingent upon your acceptance of any of these other business services.

-Payment Processing Solution                    -IT Security and Compliance Solutions
-HR, Payroll & Benefit Solutions                - Cloud Destop &Cloud Management Solutions
-Insurance Coverage Solutions                   -Data Disaster Recovery Solutions

By signing below, Borrower agrees to authorize the commencement of an application for Newtek services.

Lastly, I look forward to working with you on your loan request and hope that Newtek Business Lending will be able to assist you with the financial needs of your business, as well as Newtek Business Services providing you with additional products and services that will assist in making your business a success.

68. The Newtek letter purports to not offer a commitment to loan, while at the same time appearing to be just that – a commitment to loan $2.975 million dollars. Newtek charges a $12,000.00 good faith deposit for this "service," which was wired to Newtek Business Lending, LLC – Operating Account but it is entirely unclear where that money or what that money was used for if at all. The letter references Newtek Conventional Lending as providing financing. The letter references Newtek Business Lending as assisting with the financial needs of the business. The letter references Newtek Business Services as providing additional business services such as payroll solutions, and the website reflects "newtekone". To add to the "Newtek" confusion, the letter is signed by Defendant, Daniel C. Eshbaugh, Senior Vice President Commercial Lending, Newtek Business Lending LLC, but at no point does the letter make a clear statement of which Newtek entity would be the lender.

69. As it stands, it appears the Newtek Conventional Lending reference was materially misleading as the entity Newtek Conventional Lending, LLC, according to NewtekOne, Inc.'s own public filings discovered only after the collapse of the loan process, ceased making loans and doing business two years earlier. This, however, was not disclosed directly to the Plaintiff and is contrary

to the direct representations made to the Plaintiff concerning processing a new loan. Simply put, it is entirely unclear which Newtek entity made the preliminary commitment to loan $2.975 million, but from July 2022 forward, all Newtek entities unreasonably delayed approval of the conventional loan application, made misrepresentations inconsistent with its earlier statements about the "preliminary consideration" provided in the July 21, 2022, commitment letter, and then, after six months ultimately, declined to provide financing.

70. Defendant Newtek Business Lending, LLC and Newtek Conventional Lending, LLC, and the individual officers of those entities dealing with Plaintiff, knew that they could not originate the loan to Plaintiff, and concealed that fact at the time they took Plaintiff's $12,000.00 good faith deposit. In NewtekOne, Inc.'s Form 10-K for the year ending 2022, it is disclosed that Newtek Business Lending, LLC provides 504 loans and financing through the Small Business Administration to small businesses. The same public filing disclosed that Newtek Conventional Lending, LLC ceased originating new conventional loans in 2020. But if neither of these entities were writing conventional commercial loans at the time, it was always going to be impossible for Newtek to approve the loan. None of this, however, was communicated to the Plaintiff. In fact, the contrary was communicated – that the loan approval should be no issue and it would likely be forthcoming.

## B. PLAINTIFF TAKES DETRIMENTAL ACTIONS IN RELIANCE ON NEWTEK'S CONVENTIONAL LOAN FUNDING COMMITMENT.

71. Unfortunately, based on repeated assurances from Newtek's portfolio manager Arnaldo Febles, and Newtek vice president Austin Briggs, Plaintiff was repeatedly told to use the existing working capital incurring expenses related to the KVVV Houston acquisition in detrimental reliance on those representations. Plaintiff believed, and was told, and assured by Newtek, that his business capital expenditures could simply be reimbursed out of the loan proceeds of the

conventional loan that Newtek had earlier indicated by Febles, "We can do the deal for you, right here in house, it's not a problem."

72. Plaintiff had continued to make timely payments to Newtek on the existing SBA 7a loans. In June of 2022, the portfolio manager for Newtek, Arnaldo Febles, acknowledged Plaintiff's company's impeccable payment history, Plaintiff's excellent credit, reliable cash flow, and substantial assets. Unquestionably, Febles emphasized the high likelihood of loan approval due to these compelling factors and represented he had a direct line to management who could get this through quickly. Febles specifically told Plaintiff "Don't worry, I'll see to it that it gets done."

73. Based on Febles' representation "Don't worry, I'll see to it that it gets done" amongst many others; and in reliance of the loan commitment letter of July 21, 2022, the prior approval of six previous SBA 7a loans, ongoing phone calls with various Newtek representatives and, their ongoing assurances of the loan, including Defendant Briggs' directive to provide the commitment letter to sellers so they could rely on it, and numerous emails to and from Plaintiff; Plaintiff entered into several legally binding agreements; with Newtek's complete knowledge. Unfortunately, Newtek took over 6 months to decline the loan and backtracked on its commitment, causing disruption in the planned business operations which injured Plaintiff's property and business.

74. On August 25, 2022, Plaintiff emailed Defendant Briggs and others at Newtek, the executed Purchase Agreement for KVVV, the executed Lease Agreement for KVVV, the executed Purchase Agreement for the Dallas Real Estate along with 15 other documents relevant to the TV station acquisition. Although the email and information attached was previously sent to Briggs and others at Newtek, Briggs acknowledged the receipt of the 18 Documents, stating in his email "Received, I have sent this to the conventional department.", (see Exhibit E). This acknowledgement by Briggs and others to be shown at trial confirms that Newtek had actual

knowledge that Plaintiff entered into several agreements in reliance of the $2.97 million-dollar conventional loan to purchase KVVV based on Newtek's loan commitment letter and representations.

75. On August 30, 2022, Plaintiff had a two hour plus conference call with Defendants Williams, Eshbaugh, and Briggs on the details of the conventional loan whereby Defendant Williams, a senior underwriter with the Newtek represented that Newtek could get the deal done. In the conference call, Defendants Williams, Eshbaugh, and Briggs were again made aware of, and acknowledged the contracts that Plaintiff entered into in reliance of the conventional loan commitment which included the Purchase Agreement for KVVV, the Lease Agreement for KVVV, and the Purchase Agreement for the Dallas Real Estate amongst other contractual commitments.

76. On September 21, 2022, two months after the loan application was submitted, and almost a month after the conference call, Plaintiff contacted Briggs as he had not received any communications. Briggs responded and informed the Plaintiff that "management is currently underwriting the application" and that "they seem excited about it." (See Exhibit F). Briggs also indicated that he did not believe the loan would be ready by November but provided no explanation why. Instead, he requested Plaintiff should secure an extension to December 31, 2022, with the prospective seller of property that the loan was being procured to finance. In response, the Plaintiff attempted to obtain a delay in the purchase of the KVVV station, and the Dallas real estate but Newtek's delay risked the transactions.

77. During the extended six month "review" period, Newtek had actual knowledge that Plaintiff and his companies were relying on the conventional loan to purchase KVVV and was working to conduct business. Newtek received and acknowledged the documents and contracts

Plaintiff committed to related for the acquisition purchase. As previously stated on paragraph 74.,
Newtek was also sent 18 documents which included the KVVV purchase agreement, the KVVV
station lease, the real estate transaction, and other engineering expenditures which Newtek
acknowledged receipt of. Newtek was expressly aware that Plaintiff was not only relying on the
conventional loan, but Newtek was inviting Plaintiff to continue investing into the acquisition. For
example, on October 10, 2022, Plaintiff emailed Austin Briggs asking for a status update on the
loan review process, which had been allegedly ongoing since July. Plaintiff explicitly reminded
Briggs again that a deal to purchase the Houston TV station KVVV, was signed, and a lease of the
station was also signed in reliance on this loan commitment. (see Exhibit G).

78. On October 12, 2022, Briggs responded to Plaintiff's inquiries regarding the status of
the loan application indicating that "underwriting is still reviewing the application" and that they
"are finishing up the financial spreads." Despite Briggs having an actual copy of the executed
KVVV purchase agreement uploaded to the Newtek portal and as confirmed by Briggs on August
25, 2022; Briggs' email also reconfirms that Newtek had actual knowledge of Plaintiff's pending
deal to purchase the Houston KVVV station because Briggs specifically requested that Plaintiff
tell the KVVV seller, Phil Falcone, that "underwriting is typically the longest wait time." (see
Exhibit G). It was discovered later by way of a phone conversation with the actual underwriter
Defendant Williams to be shown at trial, this was an inaccurate and misleading statement.
According to Defendant Williams, who represented himself as the actual underwriter, in a
November 16, 2022, phone call, Williams stated he had not reviewed anything despite having had
the loan application and Plaintiff's $12,000.00 good faith deposit for five months at that point.

79. On October 27, 2022, Plaintiff again asked for an update from Briggs and expressly
informed him that the deal with KVVV was on the line, that approximately $600,000.00 he had

invested in that deal in reliance on Newtek's representations that it would make the loan work over the past several months was at risk, and that his business as a whole was in jeopardy. Plaintiff again communicated the same risks and facts to Newtek in early November 2022 and added he needed to definitive answers.

### C. AFTER SIX MONTHS, NEWTEK DENIES A CONVENTIONAL LOAN IT NEVER INTENDED TO FUND AND/OR COULD NOT HAVE FUNDED

80. Plaintiff was given one last opportunity to close the KVVV transaction by the seller or the seller was going to sell it to another buyer. This was communicated by email and telephone to the highest levels at Newtek by phone and via email on November 14, 2022. On November 16, 2022, Plaintiff had a telephone conversation with Defendant Daniel F. Williams about the conventional loan wherein Williams asks the Plaintiff "we are involving real estate, are we?" and goes on to state, "I'm just worried about the timing on the appraisal." Williams' question and statement as previously underlined, along with the dialogue in the conversation thereafter to be provided at trial, will show that Williams was unfamiliar with the files provided in July 2022, and provided again in August 2022 before the conference call where he acknowledged receiving them. Williams states "a lot of this stuff is new to me so I got to figure it out".

81. Plaintiff would show at trial that the conversation confirms that Newtek failed to even look at or process the documents in their possession for over five months, if at all. Upon information and belief, the conversation also confirms that no appraisal on the Dallas property was ever even ordered despite Briggs, and Williams' earlier representations. Plaintiff asserts Williams' own statements acknowledge he was not familiar with any of the files that Briggs stated Williams was reviewing. Briggs' misrepresentations were made with the intent to, and did in fact, induce Plaintiff to continue to spend capital on the KVVV acquisition over the course of six months as well as pursue other real estate when there was no intention or ability to fund a conventional loan.

Plaintiff reasonably and justifiably relied on Briggs' representations, Febles' representations, Williams' representations, Eshbaugh's representations and others at Newtek which were later discovered to be fraudulent, and proximately caused Plaintiff to lose the KVVV station, the Dallas real estate facility, the Seattle real estate studios, the backup TV stations in California and Washinton, and deprived and/or dissuaded Plaintiff from pursuing other financing that was available in July 2022.

82. In that same November 16, 2022, conversation with Williams to be shown at trial, Plaintiff reminded Williams of the 2-hour conference call months earlier with Defendant Eshbaugh and Briggs, where Williams represented the conventional loan was going to take one, or two weeks to get done.  Plaintiff gave notice to Williams in that conversation that despite Williams' previous representations of one or two weeks it had been almost six months and $600,000.00 invested by Plaintiff.

83. At the end of November of 2022, Plaintiff was about to lose earnest money on a second real estate contract in Seattle due to Newtek's delays and confirmed with the Seattle real estate agent on that transaction that the appraisal Newtek, Briggs and Williams had represented was underway had not even been ordered. Plaintiff once again contacted the highest levels of management at Newtek to get answers when Newtek abruptly and ultimately declined to approve the conventional loan that had been pending and discussed for months.

84. This unanticipated denial was issued despite the assurances and representations of Newtek. The denial was issued despite the Plaintiff having developed a business plan reflecting hundreds of thousands in investment, of which the Newtek Defendants were made aware, and encouraged Plaintiff to keep investing in all along the way.  Specifically, this sudden and inexplicable reversal put the Plaintiff and his business in an untenable position, having already

invested over $600,000.00 in anticipation of the "sure thing" approval that Newtek had previously promised and represented through Febles, Briggs, Eshbaugh, and Williams.

85. Plaintiff was induced into a conventional loan process that was never intended to close because Defendants either did not write or ceased writing non-conforming conventional loans several years earlier and had not launched any new conventional loan joint venture at the time Plaintiff was told to apply. Newtek, Febles, Briggs, Eshbaugh, and Williams fraudulently concealed this fact to the detriment of the Plaintiff.

86. These representations were made by the Newtek entities through their written statements, e.g., the 2022 Pre-Approval Letter from Newtek, Newtek Conventional, Newtek Conventional Lending, LLC, or Newtek Business Lending, LLC, in July 2022. Defendants Arnaldo Febles, Austin Briggs, Dan Williams, and Daniel Eshbaugh, made the same or similar representations about the loan process and the loan approvals between July 2022 and November 2022 in several phone conversations some of which are recorded.

87. According to Newtek's own SEC public filings, Newtek Conventional Lending had ceased lending in 2020 whereby Plaintiff was induced into a loan application process that Newtek had no intention or even ability to actually fulfill at the time Plaintiff was directed into it. The result was that Plaintiff lost the opportunity to obtain alternative financing, used his existing working capital to position itself for an acquisition believing that he would be refinanced with his existing lender, and, ultimately, lost the KVVV acquisition, the Dallas broadcast facility, the Seattle studios, and backup TV stations.

88. Newtek's portfolio manager, Arnaldo Febles, then suggested that Plaintiff try taking out one or two of the SBA 7a loans referenced above and refinance with a Newtek SBA 504 Loan. After another decline due to ineligibility under the SBA 504 program, Newtek's portfolio manager

then suggested that the Plaintiff go to a third-party lender to take out Newtek's position on two or three loans and then resubmit them back to Newtek for a refinancing under Newtek's SBA 504 program.

89. Febles told Plaintiff the reason for Newtek's SBA 504 denial was that the loans were not written correctly at the beginning; they were collateralized in different categories as opposed to just real estate. Febles went on to tell Plaintiff, "take out the loans with your lenders and it'll clean up the paper so it comes back right for the 504 program" and thereby would free up more capital access in the SBA Section 7(a) program. More specifically, this approach would be to potentially free up an approximately $2.1 million in the SBA 7(a) program and also reduce the interest rate, which had been steadily rising during Newtek's overly delayed decision on the conventional loan application.

## D. NEWTEK REFUSES TO CLOSE ON ITS OWN $2,100,000.00 SBA 7A LOAN PAYOFFS.

90. In mid-November after learning of the conventional loan denial, and the subsequent 504 denial, Plaintiff followed Febles' next directive and requested payoff amounts for two of the loans – specifically, Defendant Febles advised Plaintiff to pay off Loan # 1629263 in the amount of approximately $800,000.00 and Loan # 235606 in the amount of approximately $1,335,000.00.

91. On November 29, 2022, Newtek supplied payoff payment letters for these loans and, importantly, represented to the Plaintiff that all related liens would be released. The payoff letters provide that Newtek would still have the right to final audit of the loans to ensure all amounts were paid, but never disclosed that lien releases would be subject to a 45-day waiting period or other business review.

92. Plaintiff proceeded to bring two third-party lenders to the table and sought to close and pay off both loans on December 27, 2022, or before year end.  Despite Newtek's own payoff

letters, and numerous emails and phone communications that Newtek would be closing, Newtek suddenly refused to close. After providing several explicit communications that all liens would be released, Newtek changed its position in that it could not provide lien releases on the subject collateral at the time of closing. Newtek's last minute withdrawal days before the end of the year, resulted in the loss of one of the third-party lenders.

93. Newtek's end of year last minute reversal was in direct contravention of its previous express representations that it would both provide releases and the payoff letters that did not disclose or indicate that lien releases were the subject of any kind of after-closing business review. Indeed, this is commercially unreasonable and, candidly, predatory behavior as it permits a lender to hold borrowers seeking to prepay or otherwise extinguish debt liability hostage to the continued terms of the loan and extorts unnecessary interest. No reasonable title company or third-party lender would ever close a refinancing where the first-party lender has refused to release all liens despite previously promising to do so several times.

94. As a direct and proximate cause of Newtek's commercially unreasonable predatory behavior, and extortion to keep Plaintiff captive in the loans, Plaintiff lost a third-party lender, which backed out of the deal when it could not close before the year's end. Despite Newtek's failure to honor its own written payoffs on December 27, 2022, on January 2, 2023, Febles contacted the Plaintiff by telephone stating that he had arranged the refinances to be approved from Management, and that it could close immediately. In direct response and reliance, the refinance lender Searchers Capital wired approximately $816,000.00 to the escrow company to pay off the SBA 7a loan to Newtek.

95. On January 4, 2023, Febles confirmed that all assets pledged as collateral would be released. This confirmation was in a series of different emails and telephone calls to different

parties that all received the same message from Febles and Newtek that the transaction would close

this time, as just week earlier Newtek was going to close but did not.

---------- Forwarded message ---------
From: **Arnaldo Febles** <afebles@newtekone.com>
Date: Wed, Jan 4, 2023 at 1:13 PM
Subject: Collateral Release=> LN# 1923223 Big Brand Management Inc.
To: Tammy Branco <tammy@palmdesertescrow.com>
Cc: Louie Comella <louie@ivoxmedia.com>


Good afternoon,


Thank you for your e-mail. All assets pledged as collateral will be released within 45 days of receipt of payoff funds. Upon borrowers' instructions, the released document(s) will be FedEx to the entity instructed by the borrower. The borrower will be responsible for the recoding and filing of said documents.


Thank you.


Arnaldo Febles | Portfolio Manager

Newtek Small Business Finance, LLC

1981 Marcus Avenue – Suite 130 | Lake Success | NY 11042

Phone: (212) 356-9567 x 10641

Email: afebles@newtekone.com


*Please remember to use your loan portal account to submit your documentation -*
***newtekreferrals.com***

**No Personal Identifying Information (PII) or Financial Information should be sent via email.**

96. The title company and Palm Desert Escrow, then wrote to Febles, requesting that the

releases be in writing and signed. Thereafter, Febles, instead of confirming the transaction, quickly

used his email program to attempt a "recall" of the previously sent payoff emails.

From: Arnaldo Febles <afebles@newtekone.com>
Date: January 4, 2023 at 3:15:15 PM CST
To: Tammy Branco <tammy@palmdesertescrow.com>
Cc: Louie Comella <louie@ivoxmedia.com>
Subject: Recall: Collateral Release=> LN# 1923223 Big Brand Management Inc.

Arnaldo Febles would like to recall the message, "Collateral Release=> LN# 1923223 Big Brand
Management Inc. ".
Notice: This communication, including any attachments, may contain information that is confidential
and non-public, and is intended only for the designated recipient(s). If you are not the intended
recipient, or if you believe that you have received this communication in error, please notify the sender
immediately by return e-mail, and promptly delete this e-mail and any attachments, without reading or
saving. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including
attachments, is prohibited and may be unlawful.

97. There are other emails recalled and attempted to be recalled by Netwek and Febles to be shown at trail. The attempts to recall emails are attempts to conceal a documentary material as defined in 18 U.S. Code § 1961(9); and they are related to a federal agency loan program. The actual attempt is also indictable and actionable as destruction of evidence under 18 U.S.C. § 1519 "anti-shredding provision" of the Sarbanes-Oxley Act. Plaintiff would contend, Newtek's recall of several different emails from different recipients is an intentional action which intends to cause a particular result. Immediately after the email recall attempts, Newtek injected new conditions to its compliance with its own payoff letters, changing their own terms, in essence moving the line to make it impossible to exit Newtek's orbit, and thereby attempting to extort more money in interest from Plaintiff and his business.

98. Plaintiff was told by Defendant Shulman after the first refusal to close in December 2022, that Newtek was in the middle of a bank acquisition and that bank acquisition may have temporarily challenged their lending power. Shulman also told Plaintiff that he was involved in that upcoming bank acquisition and would be able to "do something" outside of SBA lending process for Plaintiff soon. Shulman told Plaintiff further he would send an application referral to Plaintiff for an "SBA loan" but would get something done when the bank deal goes through.

99. A Newtek representative sent an email and as a follow up on December 29, 2022, and Shulman sent the email requesting Plaintiff to send him exactly what Plaintiff needs, and he'll see what he can do. (see Exhibit H). Shulman sent another email on January 3, 2023, to follow up but by that time Plaintiff had been told by Defendant Arnaldo Febles that Newtek was going to close on the SBA 7a $816,000.00 payoff which was in progress, so Plaintiff was expecting $350,000.00 in a few days, and did not need the $500,000.00 from the bank Shulman was involved in that hadn't closed yet.

100. Plaintiff is aware that civil RICO predicate acts involving bank fraud under 18 U.S.C. 1344 can only be brought by a bank or lending institution, however Plaintiff would assert that Shulman committed bank fraud as defined in 18 U.S.C. § 1344 when he offered and/or solicited a bank loan before Newtek Bank, N.A. was even finalized by Newtek from the OCC and other US Treasury authorities. Plaintiff would contend that the purpose of Shulman's non-SBA loan offer was part of the scheme to string Plaintiff along another month as not cause problems before the bank acquisition was completed, and to keep Plaintiff hostage in Newtek's extortive hostage orbit.

101. Plaintiff had continued to try and close on its payoff of Loan # 1629263 in the amount of approximately $816,000.00 which was in escrow per Newtek's instructions by reaching out to Defendant Barry Sloane the President, Chairman and CEO of NewtekOne, Inc. who was noticed via email on several occasions involving the claims in this Complaint before the damages occurred. Sloane was made aware of the other Defendants' actions which give rise to the Plaintiff's claims herein and was fully informed of the consequences of the other Defendants' actions should he himself not take action on behalf of Newtek. (See Exhibits I).

102. As President, Chairman and CEO of Newtek, Mr. Sloane was put on notice that he and the other Defendants had the power and control to prevent the damages that ensued before

they actually occurred. Despite such notice, Sloane and Newtek, refused to provide lien releases to close, even though the borrower had ready funds in escrow capable of extinguishing the debt entirely, as well as funds to pay ongoing expenses, and payoff several other SBA loans.

103. As CEO and President of Newtek, and Newtek's largest shareholder, Sloane is a "Control Person" as defined in corporate governance and had control to allow the specific transactions at issue to proceed. Sloane had the ability close and accept the SBA 7a loan payoffs and prevent any further injury to Plaintiff's property and business. Sloane failed to exercise reasonable care in controlling the activities of Newtek and the other Defendants. By way of his failure to act, Sloane intentionally inflicted injury on and upon the Plaintiff by his inaction to prevent the foreseeable harm he was noticed on several times. Plaintiff asserts that Sloane is liable for not allowing the SBA 7a loans to be paid off as Sloane had the power to exercise control and prevent foreseeable damages to the Plaintiff and his business caused by Newtek, and the other Defendants.

104. Newtek's refusal to honor its own payoff letters, particularly those related to the properties at 512 E. 11th St., Houston, TX, 66999 Vista Chino, Palm Springs, CA, and 68700 Dinah Shore Dr, Cathedral City, CA is an explicit act of bad faith. Not only did Newtek fail to perform on its own written commitments, but it also failed to provide any substantial justification for its sudden change of positions, further deepening the financial predicament of the Plaintiff and his business.

105. Plaintiff made numerous good faith attempts to reconcile the situation with Newtek, only to be met with continued abrupt changes in position from the lender contrary to their own written and verbal representations. Newtek persisted in its refusal to accept the payoffs it had previously specified and then wrongfully defaulted the Plaintiff on. The unexpected and

manufactured defaults not only exacerbated the Plaintiff's already precarious financial situation due directly to Newtek's breaches and misrepresentations, but it also tarnished Plaintiffs' long-standing relationships with other lenders.

106. ACCORDING TO NEWTEK'S OWN RECORDS (See Exhibits B) PLAINTIFF MAINTAINED A PERFECT PAYMENT HISTORY ON ALL LOANS until Newtek manufactured the fake loan defaults after refusing to accept their own payoffs. The manufactured loan defaults imposed by Newtek ultimately forced the Plaintiff into a corner, forcing him to quickly sell a valuable property worth $2 million for a significantly reduced price of $1.417 million and potentially paying to Newtek an amount hundreds of thousands of dollars above that which was owed on loan # 1629263 for no reason other than Newtek's own negligence, and fraud.

**E. PLAINTIFF'S INITIAL INTERACTIONS WITH NEWTEK DEFENDANTS**

107. In December 2019 in anticipation of obtaining a Small Business Administration (SBA) 7(a) loan amounting to $2,200,000.00 from Newtek, the Plaintiff relied on assurances from Newtek. The promised loan was to comprise $400,000.00 in working capital and $150,000.00 designated to settle an equipment loan. However, at the time of closing, Newtek failed to provide the full amount of working capital, falling short by $255,000.00, and erroneously paid off the Plaintiff's $150,000.00  credit line instead of the equipment loan; thereby closing the line of credit and causing difficulty in accessing working capital. This deviation from the agreed-upon terms was not only a breach of the representations made to the Plaintiff but also a violation of the relevant loan agreements.

108. In December 2019, Plaintiff advised Defendant Shulman that a Comerica loan which needed to be paid off was an equipment loan and not a credit line. Plaintiff provided the requested documentation to Newtek in a timely manner. However, on December 4, 2019, Shulman's assistant

Vice President, Defendant Daniel Paz, reached out to Plaintiff regarding a $150,000.00 lien from Comerica Bank. Paz presented two options: increasing the loan amount by $150,000.00 to refinance the debt or obtaining subordination from Comerica Bank.

109. Plaintiff advised Newtek that the liens being paid off were inaccurate and that the correct loan to be paid off was an equipment loan, not the credit line. That same month, while Plaintiff was in the process of closing the loans, several communications took place between Plaintiff, Newtek, and Karen L. Higginbotham from Comerica Bank. Newtek sent an email to Plaintiff on December 9, 2019, detailing the outstanding items required for closing the loans, including payoff letters for Comerica Bank, invoices, lease agreements, and UCC-1 filing numbers, among other things.

110. Karen L. Higginbotham from Comerica Bank sent a letter on December 10, 2019, stating that when the loans for Plaintiffs are paid in full, Comerica would release all UCC liens associated with the Comerica loans to be paid off. In preparation for the loan closing originally scheduled for December 13, 2019, Newtek requested further documentation from Plaintiff, including payoff letters from Comerica Bank and an itemized list of assets from Plaintiff, among other items. Newtek again requested that Plaintiff obtain documentation from Comerica Bank reflecting that certain UCC liens would be terminated upon receipt of payoff.

111. Comerica Bank had already provided a letter on December 10, 2019, to Plaintiff who forwarded it to Newtek confirming that when the specified loans were paid in full, Comerica Bank would release all associated UCC liens. On December 20, 2019, Shulman with Newtek started asking for lien releases again. On the morning of the new closing date, December 23, 2019, a Newtek broker, Darren Palestine with Commercial Finance Partners emailed Defendants Scott Shulman and Daniel Paz to ask for a closing statement for Plaintiff, as one was not provided.

Palestine also mentioned that one of the Comerica loans seemed to be left off, and he questioned whether it was moved to working capital. The closing seemed out of the ordinary as historically, Plaintiff had never showed up to a closing without having the opportunity to review what was being signed. Plaintiff had also never been begged by a lender to close a loan so hastily, especially without first seeing the loan documents.

112. The peculiar circumstances surrounding the loan closing only added to the unusual conduct exhibited by Newtek. Despite repeated requests to review the closing documents to be executed, the documents were not provided until the morning of December 23, 2019. Newtek hurriedly arranged the closing for that day and sent a huge package of documents to a mobile notary, for Plaintiff to execute knowing that he was at an airport terminal (Denver airport) with a narrow window of 1.5 hours as he was due to board an international flight for the holidays. On information and belief, this was a calculated move to sneak through a materially deficient loan package different than that represented by Newtek to Plaintiff. This urgency was communicated by Newtek, Scott Shulman and Daniel Paz, who insinuated that the hasty closing was crucial for the year-end financial reports presented to Newtek's shareholders. This was also echoed later by the Newtek broker Darren Palestine. Upon information and belief this manipulation was allegedly conducted to influence the stock prices of Newtek, a reckless approach to lending that has cost the Plaintiff millions of dollars.

## F. NEWTEK SHORTS PLAINTIFF $255,000.00 AT CLOSING AND PAYS OFF THE WRONG LOAN

113. The total amount to be financed by Newtek was $2.2 million, as even confirmed in a press release released by the office of Congressional Representative Pramila Jayapal, whose office assisted the Plaintiff in the processing of documents from governmental agencies to expedite the transaction. Yet, despite Plaintiff's compliance with all of Newtek's requests and the submission

of necessary documentation, Newtek failed to accurately disburse the loan funds at closing. In particular, Newtek omitted $255,000.00, which Plaintiff had expected to be included as part of the loan closing and failed to pay off the correct Comerica loan. (see Exhibit J)

114. At the closing in the Denver Airport, Plaintiff discovered that the $255,000.00 was missing and was not reflected anywhere in the closing documents, and promptly inquired about the omitted funds. Plaintiff also discovered that the Comerica credit line was paid off instead of the equipment loan, and immediately gave Newtek notice of such by calling Defendant Shulman on his cellphone, via speakerphone with the mobile notary, Plaintiff's travel partner, and others present.

115. Defendant Shulman, in no uncertain terms promised that an additional loan would be arranged within the next 24 hours and funded in the first week of January 2020 if only the Plaintiff would agree to sign off on the loans that were short $255,000.00 in working capital. Plaintiff was adamant about getting an answer as to why and how was $255,000.00 missing from the loans as it seemed to Plaintiff, using the standard of a reasonable person to be an intentional action to omit $255,000.00, not an oversight. Newtek's representatives then revealed on that same phone call that Newtek had "run out of money" for the quarter, but they insisted on closing the loans before the end of 2019 in order to present a favorable report to shareholders. Plaintiff was told by Shulman that Newtek books loans at the face value but later sells them at several times that value, so because it was year-end they needed this loan to increase their company's value in 2019 and for 2020 projections. Shulman and other Newtek representatives suggested they would make waiting until the first week of January 2020 well worth it to the Plaintiff by way of additional future funding, beyond the $255,000.00 if Plaintiff would simply sign off despite the shortage and wrong payoff.

116. Relying on Newtek's explicit representations that Plaintiff would receive the $255,000.00 loan as originally represented by Newtek, but in the first week of January 2020, and that the Comerica equipment loan was going to be paid off, Plaintiff executed the loan documents provided by Newtek for the real properties and part of the working capital and equipment. Again, Plaintiff signed the December 23, 2019, documents provided expecting and in reliance that the additional loan amount to be provided the first week of January 2020 would cover the $255,000.00 shortfall in working capital, and that the Comerica equipment loan was in fact going to be paid off separately based on Newtek's representations, lien filings, and promises.

117. On December 24, 2019, Newtek broker Darren Palestine contacted Scott Shulman asking about any issues with the disbursement and to confirm with the title. That same day, Plaintiff emailed Daniel Paz to confirm if all wires were sent out and when they could be expected. Plaintiff while in Paris, contacted Daniel Paz with Newtek to inform him that the bank officer at Comerica stated that she still did not see any payoff activity on the equipment loan and that they would check again before the end of the day. Plaintiff also inquired as to when the actual wire would be sent.

118. On the same day, Daniel Paz informed Newtek broker Darren Palestine that the loan amount had been increased to $300,000.00 and that a new portal would be needed. Additionally, Newtek indicated that Plaintiff would need to complete additional documentation for the $300,000.00 loan. Plaintiff asked Paz if the Newtek Portal Application that was sent to him was for the additional $255,000.00 that was not included in the loan that closed the day before. Paz was vaguely ambiguous and mentioned that he would deal with it on Thursday, December 26, 2019, and that Scott Shulman would no longer be involved in the new loan. It was later

communicated to Plaintiff that Shulman was no longer involved on the new loan in order to limit his liability for knowingly shorting the $255,000.00 working capital.

119. Plaintiff expressed concerns about the payoff activity on the two notes to Comerica and the actual disbursement for Plaintiff. Newtek had been provided with explicit instructions as to which loans to pay off but paid off the wrong debt obligation. Comerica had expected the same and had already released certain liens. Newtek's negligent payoff of the wrong Comerica loan has resulted in substantial damages to Plaintiff. Newtek, Daniel Paz and Scott Shulman failed to provide correct amounts of working capital and payoff the correct Comerica loans and knew or should have known the resulting consequences thereafter. By paying off the $150,000.00 Comerica credit line, Newtek closed it. Plaintiff was suddenly left without a line of credit while being shorted an additional $255,000.00 in working capital that Newtek had promised. Meanwhile, Plaintiff received numerous promises from different Newtek representatives that Newtek would rectify this negligence in the first week of January 2020. That never happened. Instead, it took almost 3 months to close the shorted working capital loan, and Newtek never paid off the equipment loan which has evolved to a litigation judgement against Plaintiff by Comerica and other damages to be shown at trial.

120. The COVID-19 Pandemic hit, and no one could figure out why the Comerica equipment loan seemed not to be paid off despite Newtek's repeated representations that it would and then did, pay it off. Plaintiff made several inquiries to Newtek, but Newtek informed Plaintiff that they could not address the status of the alleged payoff, as they had ceased all loan administration due to the pandemic. Accordingly, Comerica entered into an eight-month forbearance agreement with Plaintiff so that it could investigate. In the end, after many months of delay, Comerica sent notices and sued Plaintiff, seeking late fees, interest and the balance of the

loan, plus attorney's fees, expenses and costs which as of the date of this Complaint exceed $300,000.00 in injuries to Plaintiff directly caused by Newtek's negligence and fraud.

121. Throughout the communications with Newtek, Plaintiff provided all the necessary documentation and information as requested, including explicit instructions to pay off the correct Comerica equipment loan, which Newtek acknowledged, and to which it agreed to adhere. Despite Plaintiff's diligent efforts to address the issues with the loan disbursements and secure additional funding, Defendant Newtek's errors and oversight caused significant disruption to Plaintiff's business operations and financial stability. Further, despite these clear instructions, Newtek negligently and inaccurately paid off the Comerica credit line instead of the correct equipment loan.

122. Newtek went so far as to complete the UCCs on the Comerica equipment loan released by Comerica and transferred to Newtek, yet Newtek never paid off the equipment loan. It was not discovered that the equipment loan was unpaid until months later and, ultimately, caused a dispute between Comerica and Plaintiff. This failure by Newtek has had significant repercussions and caused significant damages, including but not limited to:

    a.     A $210,000.00 + judgment obtained by Comerica;

    b.     Legal fees of over $50,000.00 incurred in the defense of the lawsuit; and

    c.     Additional fees and expenses incurred of $46,000.00 due to Newtek and Defendants' continuous delays.

## G. A CHAPTER 11 BANKRUPTCY, AN ADVERSARY, A CONFIRMED CHAPTER 11 PLAN, AND A PENDING CIVIL SUIT

123. At the December 23, 2019, closing where Newtek as previously alleged herein shorted Plaintiff $255,000.00 at closing, and failed to pay off an equipment loan, the deficient loan was

titled in 512 E 11th St LLC, which is owned by Plaintiff and Plaintiff's business Big Brand Management Ltd. Co.

124. Plaintiff had expended significant resources to build out the 512 E 11th St Houston Texas Property secured by SBA 7a loan #235606 to accommodate the KVVV Houston TV station which Newtek had committed to fund but did not have the ability to do so. Having lost the KVVV station deal, Plaintiff was forced to sell the 512 E 11th St property at a significant loss. The property value alone was more than 2 million dollars, but Plaintiff was forced to sell it for $1,417,000.00 for which Newtek received and accepted $1,245,567.37 calling it a short sale.

125. Plaintiff would show at trial that had Newtek closed on its own payoffs in December 2022, Newtek would have been paid in full and received $1,294,751.15 pursuant to its own payoff letter. The SBA Recoupment Fee contained in the letter protecting the United States Taxpayers would have also been paid. A Subsidy Recoupment Fee (SRF) is payable to SBA for loans with a maturity of 15 years or more that are pre-paid by more than 25% of the highest outstanding principal balance during any one of the first three successive 12-month periods following loan disbursement, per 13 CFR 120.223. All fees and payments would have and could have easily been extinguished had Newtek not breached its own payoff letter and closed.

126. There were other creditors which had liens and interests on the 512 E 11th St Houston Texas Property and who maintain cross collateralized liens on properties in California known as 66999 Vista Chino, Palm Springs CA, and 68700 Dinah Shore Dr, Cathedral City, CA. Some of those creditors had also contributed to the KVVV acquisition, who would have also been paid in full in December 2022 had Newtek simply honored their own SBA 7a payoff letters.

127. Shortly after the forced sale, Plaintiff sought counsel for 512 E 11th St LLC, and a Chapter 11 Bankruptcy was filed in the United States Bankruptcy Court for the Eastern District of Texas Case No: 23-41109-11.

128. An adversary proceeding was also filed in that bankruptcy case by Plaintiff's business Big Brand Management Ltd. Co. that owned 512 E 11th St LLC, as Adv. No. 23-04050 titled Big Brand Management, Ltd., Co. et al v. Newtek Small Business Finance, LLC et al. The Adversary was filed to pay outstanding creditors' claims from any recovery from Newtek, thus holding Newtek accountable for their actions and damages that resulted from Newtek's fraud, negligence, misrepresentations, breach of contract, as well as other causes of alleged in that complaint.

129. A Chapter 11 Bankruptcy Plan was filed by the Debtor 512 E 11th St LLC, and Despite Newtek's numerous objections, the Plan was confirmed on December 1, 2023. The Confirmed Plan proposed to pay creditors 100%. The Debtor proposed to fund the Plan from litigation proceeds to be received in the ongoing Adversary litigation. The Bankruptcy Court's Order acknowledged the Plan is a Plan of liquidation and is feasible as required by 11 U.S.C. 1129(a)(11).

130. The Adversary was removed under 28 U.S.C. § 157 to United States District Court for the Eastern District of Texas under as Case No: 4:24-CV-00264-SDJ Big Brand Management, Ltd., Co. v. Newtek Small Business Finance, LLC, et al. and remains pending.

## H. NEWTEK INITIATES A FRAUDLENT FORECLOSURE TO CIRCUMVENT JUSTICE, DEFRAUD THE PLAINTIFF, AND DEFRAUD THE SBA

131. The payoff letters issued by Newtek on November 29, 2022, involving two SBA 7a totaling $2,100,000.00 are enforceable contracts that Newtek breached in December 2022 by refusing perform by accepting the payoffs and releasing liens resulting in damages and injuries to Plaintiff and his business in an amount to be shown at trial. On January 2, 2023, Defendant Febles

contacted the Plaintiff by telephone stating that he had arranged the payoffs to be approved from Newtek Management, and that they could close immediately. Due to Newtek's breach of its own payoff letters days before, Plaintiff had lost the opportunity to payoff both loans but could close on Loan #1629263.

132. In direct response and in reliance of Newtek and Febles' representations, Plaintiff and others took immediate action to close the transaction to payoff approximately $816,000.00 to Newtek. Defendant Febles and Newtek's representations caused Plaintiff to travel to California from Texas, along with the transfer and movement of money, documents, and services, from one state to another. Searchers Capital, a Texas company and the existing first lienholder on the property that was to be refinanced, wired approximately $816,000.00 from a Texas FDIC insured bank to the California escrow company to pay off Newtek who holds the second lien.

133. Plaintiff travelled by plane to Palm Springs California from Dallas Texas to execute closing documents, the title was transferred and recorded into the county records, funds were wired to escrow, but upon days after Plaintiff's return to Texas, Newtek refused to release the liens as they had previously represented, and thereafter attempted to cover up and conceal those representations through mail fraud and wire fraud. Additionally, Newtek changed their own payoff terms that resulted in Plaintiff losing millions of dollars, which evolved into Newtek's' fraudulently manufactured SBA loan defaults to collect SBA guarantees.

134. On or around May 3, 2024, the Newtek enterprise with the assistance of Clear Recon Corp, knowingly and willingly recorded a fraudulent Notice of Default in the Riverside County Records against the wrong named title holder. More specifically, the title as recorded in the Riverside County Clerks Records as directed by Newtek in January of 2023 is clearly different than the title holder Newtek is attempting to foreclose on.

135. On January 2, 2023, when Febles called Plaintiff advising him that he had arranged the payoff on Loan # 1629263 to be approved from Management, and that it could close immediately, the closing occurred and was recorded at Febles' direction.

136. In addition to Newtek's fraudulent foreclose on the wrong title holder, Plaintiff would assert that Newtek is attempting to circumvent justice in the pending litigation in the United States District Court for the Eastern District of Texas under Case No: 4:24-CV-00264-SDJ as the claims and causes of action contained therein involve the same two properties Newtek is attempting to foreclose on, and for which two of Plaintiff's businesses are the Plaintiff's in that litigation.

137. Plaintiff would also assert Newtek is also attempting to circumvent the spirit of the United States Bankruptcy Code by ignoring the claims of other creditors in the Confirmed Chapter 11 Bankruptcy case in the United States Bankruptcy Court for the Eastern District of Texas Case No: 23-41109-11. The creditor claims involve creditor liens, and in the properties Newtek is attempting to foreclose on. Newtek's fraudulent foreclosure attempts to obtain preferential treatment of Newtek's claims which are disputed in the Confirmed Chapter 11 Case by attempting to fraudulently foreclose to the detriment of Plaintiff and other creditors.

138. A Temporary Restraining Order and application for injunctive relief pending a trial on the merits of this Original Complaint is being filed contemporaneously with this Complaint to prevent irreparable harm to Plaintiff, his property and his business.

## VI. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT CLAIMS

139. The Defendants as alleged throughout this Original Complaint conducted and engaged in a pattern of unlawful racketeering activity under 18 U.S.C. § 1961 that are actionable civil violations of the Racketeer Influenced and Corrupt Organizations Act "RICO", which the Defendants' RICO violations caused the Plaintiff to suffer injury to his business and property. At

all relevant times, the Defendants' wrongful actions were committed knowingly, willfully, and maliciously, with the intent to injure and damage the Plaintiff in reckless disregard of Plaintiff's legal rights.

140. Plaintiff alleges that each Defendant herein is a RICO "person." A RICO "person" includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A RICO person can be either an individual or a corporate entity. A defendant can be both a RICO "person" and part of another RICO "enterprise." Plaintiff also alleges each individual Defendant, i.e., each person, combination of persons or combination of one or more person and an entity as defined above, is a RICO "person." The Fifth Circuit requires the RICO "person" be distinct from the RICO "enterprise." In re Burzynski, 989 F.2d 733, 743 (5th Cir. 1993). The RICO person(s) is the named defendant(s), while the RICO enterprise can be either a legal entity or an association-in-fact. St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 440 (5th Cir. 2000).

141. The Defendants are an "enterprise," (e.g., a de facto corporation acting as a single legal entity, or, alternatively, an association in fact). At all times relevant to this Complaint, Defendants constituted an association-in-fact enterprise, as defined by 18 U.S.C. § 1961(4), which was engaged in, and its activities affected, interstate commerce. The "persons" that make up the association-in-fact enterprise have integrated resources, and operations to achieve a common business purpose. Defendants participated in the management and operation of the association-in-fact enterprise by managing, facilitating, and committing multiple acts of racketeering as described above and below.

142. When the Defendants became aware that Plaintiff was going to exit all loans and/or specific loans by paying them off in full and final satisfaction, Plaintiff became another target

victim of the enterprise as Defendants extorted hundreds of thousands and defrauded of millions of dollars from Plaintiff by preventing the payoffs through racketeering activities. When Plaintiff's capital sources were almost exhausted leading up to three failed SBA 7a loan payoffs the Defendants refused to accept, the Defendants manufactured fraudulent loan defaults on the 32nd day to pursue and obtain SBA loan guarantees to continue to fund the enterprise.  On the 32nd day, the funds to pay off the SBA loan and the funds to make ongoing payments were still available in escrow and RICO Defendants including Sloan, Febles, Shulman, and others were aware and part of the scheme.

### The Fraudulent Schemes

143. The pattern of racketeering activity in which the Defendants engaged involved numerous specific transactions as described in detail in this Complaint and to be shown at trail. The pattern of racketeering engaged in by Defendants involved and involves a scheme to defraud, extort and steal from Plaintiff and others, which for Plaintiff began on or before December 23, 2019, and continues to the present day, and includes, among others, the RICO predicate acts described below. The RICO Defendants, co-conspirators, and other Newtek associates, employees, affiliates would seek to Defraud the Plaintiff and others, including the SBA by manufacturing fraudulent loan defaults to collect SBA guarantees. To ensure these defaults to collect guarantees would appear legitimate to the SBA and others that purchased the guarantees, the RICO Defendants conspired with each other to achieve an object; and for which there was a meeting of the minds for the purpose of pecuniary gain by unlawful means to default loans whenever possible, and the RICO Defendants would do whatever they could including, making false statements, recalling emails, destroying documents, and creating conditions and situations to purposely cause or induce the defaults. The RICO Defendants and others devised a scheme to work in unison to

obtain technical defaults or to induce defaults under the guise of mistake or for most any reason or kind and with immediacy, often within a day, or days of a technical default would commence the SBA collection liquidation process. Once a default was commenced, the RICO Defendants would make it impossible for Plaintiff and others held captive in the extortive orbit to satisfy or comply with the RICO Defendants, and co-conspirators ever changing demands. After the impossibility of compliance was established and imminent, the RICO Defendants, co-conspirators, and others would submit SBA loan guarantees to be paid on the intentionally defaulted loans. The manufactured defaults were submitted in piecemeal and/or in structured stages to prevent suspicion or bring any scrutiny to the attention of federal regulators.

144. The RICO Defendants, co-conspirators, and other Newtek associates, employees, and affiliates would seek to Defraud the Plaintiff and others, by predatorily preventing SBA loan payoffs to generate ongoing income for the enterprise, and ultimately themselves, by holding the Plaintiff, and others hostage to loan agreements by whatever means necessary which include making false statements, recalling emails, concealing documents, issuing knowingly fraudulent loan commitments with six month review times on loans that cannot actually be made, and creating false new and impossible conditions, inventing bogus situations, feigning excuses and even unilaterally changing material terms of written agreements without legal justification, or simply put, "moving the line" to prevent payoffs on performing loans.

### Purpose of the Scheme

145. The purpose of the scheme was for the RICO Defendants and co-conspirators, and others to generate unlawful revenue for Newtek the enterprise and ultimately compensation for themselves guised in the form of referral fees, bonuses, stock interests, kickbacks, and other compensation, and investment interests in other enterprises, enterprise associates, acquisition

interests in joint ventures  and subsidiaries. The revenue sources generated from Plaintiff and others go to include fraudulently manufactured defaults on SBA loan guarantees and extortive loan payments from legitimate loans. Another purpose of the scheme(s) is to manipulate financials and influence stock prices to attract legitimate and otherwise unknowing investors to keep generating revenue to keep the Ponzi type scheme from imploding while at the same time allowing the RICO Defendants like Barry Sloane, Scott Shulman, and others to siphon money through stock interests in Newtek that allege profitability while hiding the fraud.

## VII. RICO PREDICATE ACTS UNDER 18 U.S.C. §§ 1961-1968

146. From December 2019 to present 2024, Defendants' actions outlined herein constitute a pattern of racketeering activity as defined at 18 U.S.C. § 1961(5), are representative of Defendants' pattern and course of practice and are capable of repetition. Moreover, the Defendants' actions are "related" and "continuous" and have become a regular way of conducting business.

**A. Newtek, Scott Shulman, Daniel Paz, and others Fraudulently Misrepresent a Loan Amount at Closing Shorting Plaintiff $255,000.00 – December 2019**

147. Shorting Plaintiff $255,000.00 of loan proceeds on December 23, 2019, was not and could not have been a mere oversight by Newtek. It was done knowingly and willfully and was intended to cause a specific result. It was part of a scheme or artifice to defraud the Plaintiff of an intangible right to honest services. The failure to provide $255,000.00 to the Plaintiff on the date of closing was a fraudulent and/or negligent misrepresentation made involving a government agency loan program, and the fraudulent misrepresentations were made to Plaintiff by telephone, email, and US Mail which constitutes RICO predicate acts of mail fraud, and/or wire fraud pursuant to 18 U.S.C. § 1341, and 18 U.S.C. § 1343.

**B. Newtek, Scott Shulman, Daniel Paz, and others Obtain UCC Filings on an Equipment Loan Refinance, but never Refinance the Loan as Represented – December 2019**

148. Newtek, Shulman, Paz, and others made fraudulent and/or negligent representations to Plaintiff and others that Newtek would pay off a Comerica equipment loan on December 23, 2019. Thereafter into mid and late 2020, despite emails and phone calls to Newtek, Shulman, Paz, and others, the Defendants failed to pay off a Comerica equipment loan as represented and never resolved the failed payoff resulting in damages to Plaintiff to date of more than $300,000.00. Newtek placed UCC filings on equipment securing the Comerica Bank equipment loan slated to be refinanced but Newtek never refinanced the loan.

149. Defendants' placement of UCC liens on property without consideration of paying off the Comerica equipment loan as repeatedly represented by Newtek, to Plaintiff and others is fraudulent, and the failure to refinance the loan as represented to Plaintiff and others is a negligent and/or fraudulent misrepresentation. Thes actions were part of a scheme or artifice to defraud the Plaintiff of an intangible right to honest services and the misrepresentations were made to Plaintiff from December 2019 to at least January 2021, using telephone, email, and US Mail. The transmission of the UCC liens involving an FDIC insured bank to the detriment of the Plaintiff, were transmitted through email internet servers in interstate commerce and constitutes RICO predicate acts of fraud, mail fraud, and wire fraud pursuant to 18 U.S.C. § 1341, and 18 U.S.C. § 1343.

**C. Newtek Issues a $2.975MM Fraudulent Loan Commitment to Plaintiff – July 2022**

150. The issuance of a $2.975 million loan commitment to Plaintiff in July 2022 was fraudulent at the time it was issued according to Newtek's own SEC filings, and even confirmed by one of their attorneys, as none of the Newtek entities represented in the letter could have made a conventional loan at the time the commitment was issued. Plaintiff justifiably relied upon the commitment letter which Defendants knew, and/or should have known at the time was fraudulent

and Defendants concealed such from the Plaintiff resulting in damages to Plaintiff of over $5,000,000.00 to be shown at trial. The purpose of the fraudulent loan commitment was to extort more money for the enterprise and Defendants by preventing Plaintiff from taking his loans elsewhere. Newtek charged Plaintiff a $12,000.00 good faith deposit for a non-existent service somehow related to the fraudulent loan commitment which was wired from an FDIC insured bank to an FDIC insured bank. The fraudulent commitment letter was part of a scheme or artifice to defraud the Plaintiff and was transmitted by email through internet servers in interstate commerce and sent via US Mail and constitutes RICO predicate acts of fraud, mail fraud, and/or wire fraud pursuant to 18 U.S.C. § 1341, and 18 U.S.C. § 1343.

**D. Newtek Issues Payoff Letters to Plaintiff to Pay Off Loans, Then Refuses to Close on two SBA 7a Loan Payoffs of $2,100,000.00 – 2022**

151. The payoff letters issued by Newtek on November 29, 2022, involving two SBA 7a loans are enforceable contracts related to government agency loan documents and/or loan documents as defined at 12 CFR § 618.8325 (a) 5; and were also written contract commitments by Newtek. As SBA loan program participants Defendants were bound to accept payoffs in full and final satisfaction of two SBA 7a guaranteed loans once the payoff letters were issued. The payoff letters included the SBA loan numbers, the SBA recoupment fees, and numerous accompanying emails from Newtek which clearly and concisely state in no uncertain terms "all assets pledged as collateral will be released". On or around December 27, 2022, Newtek refused to honor their own payoff letters on $2,100,000.00 of SBA 7a loans.

152. Newtek's refusal to accept their own payoffs has injured Plaintiff's business and property, causing Plaintiff millions in damages, defrauding Plaintiff, and others to include the United States taxpayers and the SBA. The refusal to accept loan payoffs was part of a scheme or artifice to defraud the Plaintiff and others. The fraudulent payoff letters were transmitted by email

through internet servers in interstate commerce and were sent by US Mail which constitutes the RICO predicate acts of mail fraud, and/or wire fraud pursuant to 18 U.S.C. § 1341, and 18 U.S.C. § 1343.

**E. Newtek Requests a Second SBA 7a Loan Payoff for $816,000.00, Funds are Wired, Title is Transferred, but Newtek Refuses to Release Liens and Changes its own Payoff Terms again – 2023**

153. On January 2, 2023, Defendant Febles contacted the Plaintiff by telephone stating that he had arranged the payoff on Loan # 1629263 to be approved from Management, and that it could close immediately. In direct response and in reliance of those representations, the new lender who is also the first lienholder wired approximately $816,000.00 from an FDIC insured bank in Texas to the escrow company in California to pay off Newtek and the SBA.

154. Plaintiff flew to California and executed closing documents, title was transferred and recorded into the county recorder's records, but Newtek for a third time refused to release liens as previously represented in their payoff letter, several emails, and numerous phone calls. The Defendant's failure to accept the $816,000.00 payoff of the SBA 7a loan attempts to extort more interest from the Plaintiff and deprives United States taxpayers and the SBA of funds, holding out the SBA unnecessarily pay guarantee fees when the Plaintiff tendered the funds to do so.

155. The failure to accept payoff funds in the amount of $816,000.00 for a second time was part of a scheme or artifice to defraud the Plaintiff and others. The calls from Febles making misrepresentations to Plaintiff were transmitted by telephone, the funds requested by Newtek were wired from a Texas FDIC insured bank to a California FDIC insured bank, the failure to accept payment obstructs a government agency loan program, and the payoff letter and other written communications were transmitted by email through internet servers in interstate commerce which constitutes RICO predicate acts of fraud, mail fraud, and/or wire fraud pursuant to 18 U.S.C. § 1341, and 18 U.S.C. § 1343.

**F. Newtek Attempts to Recall Emails sent to Plaintiff and Others to Cover up Newtek's Fraudulent Conduct, attempts Destruction and/or Concealment of Loan Documents Related to a Federal Agency Program – 2023**

156. Newtek and Defendant Febles' recalled emails previously sent to Plaintiff and others were made knowingly and willingly to conceal and/or destroy documentary material as defined in 18 U.S.C. § 1961(9); and are related to a federal agency loan program. The concealment attempt is indictable and actionable as destruction of evidence under 18 U.S.C. § 1519 Destruction, alteration, or falsification of records within the "anti-shredding provision" of the Sarbanes-Oxley Act, and/or alternatively under 18 U.S.C. § 1512(c)(1) and(2).

157. Newtek and Defendant Febles' email recalls to conceal and cover up facts involving federal agency documents and material records related to the SBA loan program obstructs justice and is indictable under 18 U.S.C. § 1512(c)(2), and the attempts to recall the emails were part of scheme or artifice to defraud, Plaintiff and others, and for obtaining money or property by means of false or fraudulent pretenses, representations, or promises in violation of the federal mail fraud statute, 18 U.S.C. § 1341. The attempts were transmissions by email through internet servers in interstate commerce and constitutes RICO predicate acts of mail fraud, and/or wire fraud pursuant to 18 U.S.C. § 1341, and 18 U.S.C. § 1343.

**G. Newtek Manufactures Fake Loan Defaults on Plaintiff's Perfect SBA 7a Loan Payment History to Cover Up Newtek's Negligent Actions and Fraudulently Collect SBA Loan Guarantees – 2023**

158. Notably, when Plaintiff asked for and received payoff letters on or about November 29, 2022, Plaintiff had never been late on any payments to Newtek, ever. Every single Newtek loan was current and in compliance until Newtek later wrongfully and unnecessarily defaulted Plaintiff in February 2023 transmitted by email from Small Business Lending, LLC a subsidiary of Defendant Newtek Bank, N.A.. Newtek, and Defendant Febles' manufactured SBA loan

defaults on Plaintiff's loans were fraudulent at the time they were made. The fraudulent defaults were made knowingly and willingly by the RICO Defendants while over $816,000.00 was in escrow and $350,000.00 more was available to Plaintiff but Newtek, Febles, Sloane, Shulman and others known and unknown prevented and deprived Plaintiff of such through a fraudulent scheme. Upon information and belief, the fake SBA loan defaults are considered documentary material as defined in 18 U.S.C. § 1961(9); and are related to a federal agency loan program.

159. Plaintiff asserts that the RICO Defendants' actions are part of scheme or artifice to defraud Plaintiff, and his business, for obtaining money or property by means of false or fraudulent pretenses, representations, or promises in violation of the federal mail fraud statute, 18 U.S.C. § 1341. The manufactured SBA loan defaults were transmitted by email from Small Business Lending, LLC a subsidiary of Defendant Newtek Bank, N.A.. through internet servers in interstate commerce and constitutes RICO predicate acts of and mail fraud, and wire fraud pursuant to 18 U.S.C. § 1341, and 18 U.S.C. § 1343.

**H. Newtek Attempts to Fraudulently Foreclose on the Property It Refused to Accept its own Payoffs on to Collect SBA Loan Guarantees – 2024**

160. Newtek and the other Defendants have attempted to obstruct justice by fraudulently initiating foreclosure proceedings on Plaintiff's business property. Newtek attempts to foreclosure on a name that is not the title owner of record. Newtek willfully recorded a knowingly fraudulent Notice of Default into county records under a different name than the title holder which conclusively establishes that Newtek's foreclosure is fraudulent. The recording of a document into county records to conduct a foreclosure is an intentional action which was made knowingly and willingly despite the fact that public records clearly reflect a different owner of record. The January 11, 2023, closing whereby Newtek directed and initiated a payoff and then refused to accept their own $816,000.00 payoff, caused a transfer of ownership into the current title holder and grantor

Plaintiff herein to occur. Newtek's attempt to foreclosure on a name that is not the title owner of record or grantor conclusively establishes that Newtek's foreclosure is fraudulent, and again reflects the closing occurred on January 11, 2023.

161. Furthermore, Plaintiff would contend Newtek is attempting to fraudulently foreclose despite the uncontroverted fact that  Newtek refused to accept its own payoffs, which would have extinguished $2,100,000.00 of SBA 7a loans. Newtek is now attempting to have the SBA pay for Newtek's fraud, at the unnecessary expense of the Unted States government.

162. The willful recording of the Notice of Default in the name of the wrong grantor and titleholder is on its face fraudulent; and the initiation of foreclosure proceedings are blatant attempts to obstruct justice and were a part of a scheme or artifice to defraud the Plaintiff and others. The notices of default and recordings into the Riverside County Title Records were fraudulent and were transmitted by U.S. Mail and online records through internet servers thus involve interstate commerce and constitutes RICO predicate acts of mail fraud and wire fraud pursuant to 18 U.S.C. § 1341, and 18 U.S.C. § 1343.

**I. A Brief Summary of Newtek and Defendants' Overt Acts in furtherance of the Schemes**

**The Overt Acts**

163.    From at least in or about early December 2019 through in or about September 2024, in in the Eastern District of Texas, California, Washington, Colorado and elsewhere, Defendants, conspired and agreed, together through a meeting of the minds, and with each other, and others, known and unknown to the Plaintiff, to commit offenses against the Plaintiff and others, in furtherance of the RICO Defendants' racketeering schemes and predicate acts as alleged to accomplish its objects, with, through and for the benefit of Defendants and the association in fact enterprise, the Defendants as named, and others known, and unknown, unlawfully, willfully,

and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and through internet servers, used and employed manipulative and deceptive schemes, committed the following overt acts, among several others to be shown at trail, in violation of 18 U.S. Code § 1343 – Wire Fraud; and 18 U.S. Code § 1341 – Mail Fraud.

## The Wirings

164.    From December 2019 to 2024, there are approximately 120 RICO related wirings from the Defendants, to be presented at trial. For the purposes of illustration, the following counts are provided and occurred on or about each of the dates set forth below, in the Eastern District of Texas, California, Washington, Colorado and elsewhere, having devised and intending to devise their schemes, the RICO Defendants for the purpose of executing the schemes described above and below, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below, each transmission constituting a separate count, all in violation of Title 18, United States Code, Section 1343; and 18 U.S. Code § 1341.

165.    On or about December 23, 2019, Defendant Shulman had a telephone conversation with Plaintiff, and with others present, whereby Shulman knowingly made misrepresentations to provide a $255,000.00 loan to Plaintiff in the first week of January 2020. Defendant Shulman's statements were false at the time they were made as Shulman knew or should have known that the SBA 7a loan process takes more than ten (10) days, and such misrepresentations by Shulman were intended to induce Plaintiff to execute knowingly deficient loan documents, and cause Plaintiff to refrain from delaying the signing a total of $1.9 million-dollar loans as part of a scheme to manipulate Newtek stock price before the yearend to the detriment of the Plaintiff resulting in injury to his business.

166.   On or about December 23, 2019, Defendant Paz had a telephone conversation with Plaintiff, and with others present, whereby Paz knowingly made misrepresentations that a Comerica equipment loan was going to be paid off in full and final satisfaction. Defendant Paz's statements were false at the time they were made as Paz knew or should have known that the funds were not allocated correctly, and such misrepresentations by Paz were intended to induce Plaintiff to execute knowingly deficient loan documents, and cause Plaintiff to refrain from delaying the signing a total of $1.9 million-dollar loans as part of a scheme to manipulate Newtek stock price before the yearend to the detriment of the Plaintiff resulting in injury to his business.

167.   On or about June 30,2022 Defendant Febles in a telephone conversation with Plaintiff and told Plaintiff he could arrange a $2,000,000.00 conventional loan from Defendant Newtek Conventional Lending, LLC. Febles also stated "You don't need to go anywhere else for that, we can do the deal for you, right here in house it's not a problem," and "you've been here a while, you're a payer; it's perfect, I'll put in a referral." Febles' statements were intended to induce Plaintiff to pay another month of payments unnecessarily, and cause Plaintiff to refrain from pursuing financing elsewhere as Febles was aware Plaintiff had such financing immediately available. Febles' statements were knowingly false, and/or made without exercising due care or competence as according to Newtek's own SEC filings, Newtek Conventional Lending, LLC had stopped making conventional loans in 2020.

168.   On or about June 30,2022, Defendant Febles sent an email to Plaintiff, acknowledging a conversation earlier that same date to provide a conventional loan to Plaintiff from Defendant Newtek Conventional Lending, LLC intended to induce Plaintiff to paying another month of payments unnecessarily, and cause Plaintiff to refrain from pursuing financing elsewhere as Febles was aware Plaintiff had such financing immediately available. Febles' statements were

knowingly false, and/or made without exercising due care or competence as Newtek Conventional Lending, LLC had stopped making conventional loans in 2020.

169.    On or about July 21, 2022, Defendant Briggs sent a fraudulent loan commitment letter by email for a $2.975 million dollar loan to Plaintiff and two of his businesses from Newtek Conventional Lending. The commitment letter from Newtek Conventional Lending was knowingly false, and/or was provided without exercising due care or competence as according to Newtek's own SEC filings, Newtek Conventional Lending, LLC had stopped making conventional loans in 2020.

170.    On or about July 28, 2022, Defendant Briggs sent a fraudulent loan commitment letter by email executed by Defendant Dan Eshbaugh for a $2.975 million dollar loan to Plaintiff and two of his businesses from Newtek Conventional Lending. The commitment letter from Newtek Conventional Lending was knowingly false, and/or made without exercising due care or competence as according to Newtek's own SEC filings, Newtek Conventional Lending, LLC had stopped making conventional loans in 2020.

171.    On or about July 28, 2022, Defendant Briggs sent a request for confirmation and acknowledgement of a $12,000.00 bank wire sent by Plaintiff from an FDIC insured bank to Defendant Newtek Business Lending LLC, for the benefit of Defendant Newtek Conventional Lending, LLC. Defendant Briggs caused a wire to be sent as part of the scheme to defraud the Plaintiff as no conventional loan could have been made and the request for Plaintiff to send money deprived the Plaintiff of its use and the request was knowingly false, and/or made without exercising due care or competence as according to Newtek's own SEC filings, Newtek Conventional Lending, LLC had stopped making conventional loans in 2020.

172.   On or about July 28, 2022, Defendant Briggs sent a follow up request on the confirmation and acknowledgement of a $12,000.00 bank wire sent by Plaintiff from an FDIC insured bank to Defendant Newtek Business Lending LLC, for the benefit of Defendant Newtek Conventional Lending, LLC. Defendant Briggs' email states "Just a follow up. The conventional team is working on fixing this issue. We may not be able to get this revised until Monday." Defendant Briggs caused the $12,000.00 wire to be sent as part of the scheme to defraud the Plaintiff as no conventional loan could have been made and the request for Plaintiff to send money deprived the Plaintiff of its use and the follow up was knowingly false, and/or made without exercising due care or competence as according to Newtek's own SEC filings, Newtek Conventional Lending, LLC had stopped making conventional loans in 2020.

173.   On or about August 30, 2022, Defendants Briggs, Williams, and Eshbaugh participated in a two (2) hour conference call with Plaintiff where Defendants knowingly and willfully made several misrepresentations as to the ease, certainty, and timing of a $2.975 million dollar conventional loan from Defendant Newtek Conventional Lending, LLC, that could not have been made as Newtek's own SEC filings state that Newtek Conventional Lending, LLC ceased making loans in 2020. This was concealed by Defendants Briggs, Williams, and Eshbaugh as part of a scheme to induce the Plaintiff to continue to pay Newtek extortive and unnecessary payments and prevent Plaintiff from taking his loans elsewhere as Defendants Briggs, Williams, and Eshbaugh were aware Plaintiff had financing in place to do so.

174.   On or about September 7, 2022, Defendant Briggs, provided a knowingly false representation and update regarding Defendant Dan Williams' review of Plaintiff's $2.975 million-dollar conventional loan commitment from Defendant Newtek Conventional Lending, LLC, that could not have been made as Newtek's own SEC filings state that Newtek Conventional

Lending, LLC ceased making loans in 2020. It was also discovered by way of a November 16, 2022, phone conversation with Williams that he had not reviewed the file at all.

175.    On or about September 12, 2022, Defendant Briggs, provided a knowingly false representation and update regarding Defendant Dan Williams' review of Plaintiff's $2.975 million-dollar conventional loan commitment from Defendant Newtek Conventional Lending, LLC, that could not have been made as Newtek's own SEC filings state that Newtek Conventional Lending, LLC ceased making loans in 2020. It was also discovered by way of a November 16, 2022, phone conversation with Williams that he had not reviewed the file at all.

176.    On or about September 21, 2022, Defendant Briggs sent an email to Plaintiff, which contained knowingly false representations as part of the scheme intended to extort Plaintiff to continue making unjustified and excessively high ongoing payments to Newtek, and to further conceal the fraudulent loan commitment from Defendant Newtek Conventional Lending, LLC, which could not have been made as Newtek's own SEC filings state that Newtek Conventional Lending, LLC ceased making loans in 2020. The email states that "they don't expect the loan to be ready by November. Is there anyway you can provide an extension to December 31st." This statement was made willfully to further the scheme to induce Plaintiff and others to continue to rely on the nonexistent conventional loan facility and continue making payments for almost 4 more months at approximately $50,000.00 per month, while knowingly and willfully concealing that no conventional loan was available.

177.    On or about October 10, 2022, Defendant Briggs, provided a knowingly false representation and update regarding Defendant Dan Williams' review of Plaintiff's $2.975 million-dollar conventional loan commitment from Defendant Newtek Conventional Lending, LLC, that could not have been made as Newtek's own SEC filings state that Newtek Conventional

Lending, LLC ceased making loans in 2020. It was also discovered by way of a November 16, 2022, phone conversation with Williams that he had not reviewed the file at all.

178.   On or about October 12, 2022, Defendant Briggs, provided a knowingly false representation and update regarding Defendant Dan Williams' review of Plaintiff's $2.975 million-dollar conventional loan commitment from Defendant Newtek Conventional Lending, LLC, that could not have been made as Newtek's own SEC filings state that Newtek Conventional Lending, LLC ceased making loans in 2020. It was also discovered by way of a November 16, 2022, phone conversation with Williams that he had not reviewed the file at all.

179.   On or about November 16, 2022, Defendant Williams contacted Plaintiff by telephone, and made several knowingly false representations such as he would order an appraisal for a Seattle property, and that he would see to it that the $2.975 million-dollar conventional loan commitment from Defendant Newtek Conventional Lending, LLC, would be completed before December 31, 2022. Those statements were knowingly false at the time Williams made them in that the conventional loan could not have been made as Newtek's own SEC filings state that Newtek Conventional Lending, LLC ceased making loans in 2020.

180.   On or about November 29, 2022, Defendant Febles sent an email to Plaintiff, with three (3) payoff letters on three (3) different SBA 7a loans to be paid off on December 28, 2022, and December 30, 2022. Febles misrepresentations in the letters and the email were knowingly false at the time they were made and were part of a scheme to induce the Plaintiff to continue to pay Newtek extortive and unnecessary payments of approximately $50,000.00 per month, while knowingly and willfully concealing that no conventional loan was available and preventing Plaintiff from taking his loans elsewhere.

181.     On or about December 28, 2022, Defendant Febles sent an email to Plaintiff, with five (5) payoff letters on five (5) different SBA 7a loans of which two (2) were set to be paid off, one on December 28, 2022, and another on December 30, 2022. Febles knowingly and willfully made misrepresentations in the letters and the email that were false at the time they were made and were part of a scheme to induce the Plaintiff to continue to pay Newtek extortive and unnecessary payments of approximately $50,000.00 per month, while knowingly and willfully concealing that no conventional loan was available, and thereby preventing Plaintiff from taking his loans elsewhere. Two of the SBA 7a loans were set to be paid off and funds were available to be wired however Febles intentionally refused to allow the loans to be paid to keep Plaintiff an extorted financial hostage.

182.     On or about December 29, 2022, Defendant Shulman had a telephone conversation with Plaintiff, whereby Shulman knowingly made false misrepresentations to provide a $500,000.00 bank loan to Plaintiff from an upcoming bank acquisition by Newtek. Shulman told Plaintiff he would be sending a referral under SBA loan program by email, but he would be providing the loan from the new bank acquisition as he would have the authority to do so soon. Defendant Shulman's statements were false at the time they were made as Shulman knew or should have known that he could not offer a loan from a bank acquisition that wasn't completed. Plaintiff had reason to believe Shulman could do as he represented based on Shulman's tenure with Newtek and his place in the hierarchy of Newtek management; and as such Plaintiff relied on Shulman's misrepresentations to his detriment. The misrepresentations by Shulman were intended to induce Plaintiff to continue to pay another month of approximately $50,000.00, and as part of a scheme to manipulate Newtek stock price before the yearend.

183.    On or about December 29,2022, Defendant Shulman emailed Plaintiff in furtherance of the scheme to induce Plaintiff to continue to pay another month of extortive interest of approximately $50,000.00, and as part of the scheme to manipulate Newtek stock price before the yearend. Shulman's email seeks to delay Plaintiff and cause Plaintiff to refrain from takings action in reliance of a supposed bank loan from a bank acquisition that had not yet taken place. Plaintiff had reason to believe Shulman could do as he represented based on Shulman's tenure with Newtek and his place in the hierarchy of Newtek management; and as such Plaintiff relied on Shulman's misrepresentations to his detriment.

184.    On or about December 30,2022 Defendant Febles contacted Plaintiff by phone and stated that he might be able to arrange a payoff after the first of the year and would contact Plaintiff again on January 2, 2023. The phone call to Plaintiff was knowingly fraudulent and was intended to induce Plaintiff to continue to pay another month of approximately $50,000.00, and as part of a scheme to manipulate Newtek stock price before the yearend and keep Plaintiff a financial hostage.

185.    On or about January 4, 2023, Defendant Febles sent an email to Plaintiff and others, with a payoff letter on loan Newtek loan 1629263 / SBA loan 1248829103 confirming that all assets pledged as collateral would be released. This confirmation email was part of a series of different emails to different parties that all received the same message from Newtek that the transaction would close this time, as just week earlier Newtek was going to close but did not. Febles' email was a blatant misrepresentation and knowingly false in that Newtek ultimately refused the payoff contained in the email on two separate occasions.

186.    On or about January 4, 2023, Defendant Febles sent an email to Plaintiff and others, with a payoff letter on loan Newtek loan 1629263 / SBA loan 1248829103 confirming that all assets pledged as collateral would be released. Febles' email was a blatant misrepresentation and

knowingly false in that Newtek ultimately refused the payoff contained in the email on two separate occasions.

187.    On or about January 4, 2023, Defendant Febles attempted to "recall" several emails to conceal their contents that clearly and concisely state the terms of the $816,725.27 Newtek loan 1629263 / SBA loan 1248829103 that Newtek refused to accept.

188.    On or about January 4, 2023, Defendant Febles attempted to "recall" the email of November 29, 2022, at 6:16pm CST, that contained the payoff letters for loan numbers 235606, 1629263, and 1196944 to conceal their contents that clearly and concisely state the terms of those loans that Newtek refused to accept in December 2022.

189.    On or about January 12, 2023, at 12:48pm CST, Defendant Febles sent an email to Plaintiff and others, in regard to the payoff on loan Newtek loan 1629263 / SBA loan 1248829103 confirming again that all assets pledged as collateral would be released and stated specifically "The information you are requesting is no cause to delay the payoff" which was actually already wired to escrow at the time of the email and the title had already been transferred from Newtek to Plaintiff and his new lender and recorded into the Riverside County Recorder's records. Febles' email was misleading and knowingly false in that Newtek ultimately refused the payoff it requested to not delay. This email was in furtherance of Defendants' scheme to defraud Plaintiff, and others.

190.    On or about January 12, 2023, at 9:02am CST, Defendant Febles sent an email to Plaintiff and others, regarding the payoff on loan Newtek loan 1629263 / SBA loan 1248829103 stating "Upon receipt of funds the collateral will be released." Febles knew funds were already wired to escrow at the time of the email and the title had already been transferred from Newtek to Plaintiff and his new lender and recorded into the Riverside County Recorder's records. Febles' email was misleading and knowingly false in that Newtek ultimately refused the payoff it

requested. This email was in furtherance of the Defendants' scheme to defraud Plaintiff, and others.

191.    On or about January 12, 2023, at 8:19am CST, Defendant Febles sent an email to Plaintiff and others, regarding the payoff on loan Newtek loan 1629263 / SBA loan 1248829103 stating "Once the funds are received the pledge collateral will be released." Febles knew funds were already wired to escrow at the time of the email and the title had already been transferred from Newtek to Plaintiff and his new lender and recorded into the Riverside County Recorder's records. Febles' email was misleading and knowingly false in that Newtek ultimately refused the payoff it requested. This email was in furtherance of the Defendants' scheme to defraud Plaintiff, and others.

192.    On or about January 13, 2023, Defendant Febles sent an email to Plaintiff while the $816,000.00 sat in escrow to pay off on loan Newtek loan 1629263 / SBA loan 1248829103 and the title had already been transferred from Newtek to Plaintiff and his new lender and recorded into the Riverside County Recorder's records at Febles' direction, Febles' changed the terms of the already closed transaction. The email was misleading and knowingly false in that Newtek ultimately refused the payoff it requested and was in furtherance of the Defendants' scheme to defraud Plaintiff, and others.

193.    On or about January 16, 2023, Defendant Febles sent an email to Plaintiff while the $816,000.00 sat in escrow to pay off on loan Newtek loan 1629263 / SBA loan 1248829103 and the title had already been transferred from Newtek to Plaintiff and his new lender and recorded into the Riverside County Recorder's records at Febles' direction, Febles' made reference to all loans being past due. The email was misleading and knowingly false in that Newtek ultimately

refused the payoff it requested and was in furtherance of the Defendants' scheme to defraud Plaintiff, and others, and prevented and deprived Plaintiff from accessing $350,000.00.

194.    On or about February 2, 2023, at 3:25:17 PM CST, Defendant Febles sent an email to Plaintiff intentionally defaulting all loans while the $816,000.00 sat in escrow to pay off on loan Newtek loan 1629263 / SBA loan 1248829103 and the title had already been transferred from Newtek to Plaintiff and his new lender and recorded into the Riverside County Recorder's records at Febles' direction. The email was misleading and knowingly false in that Newtek ultimately refused the payoff it requested and was in furtherance of the Defendants' scheme to defraud Plaintiff, and others, and prevented and deprived Plaintiff from accessing $350,000.00.

## COUNT 1: VIOLATION OF TITLE 18 U.S.C. § 1962(c) - (Civil RICO)
### (Against All Defendants)

195. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein in their entirety.

196. Each of the Defendants participated in the conduct outlined herein as set forth above, by, among others, engaging in transactions constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

197. Under 18 U.S.C. § 1964(c):

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

198. 18 U.S.C. § 1962(c) provides as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

199. Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

200. The Defendants together form an association-in-fact (along with being separate legal enterprises) for the common and continuing purpose of engaging in schemes to defraud others, including Plaintiff, the SBA, and others with which the enterprise has dealt and deals with, among other things; manufacturing fraudulent loan defaults to collect SBA loan guarantees, manipulation of federally guaranteed loans to influence stock prices to the detriment of Plaintiff and others, extorting Plaintiff and others, by failing to accept SBA guaranteed loan payoffs, and other acts as complained of above and below. This constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4). The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the culpable individuals.

201. The pattern of racketeering activity in which the Defendants engaged involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting wire fraud (18 U.S.C. § 1343); and constituting mail fraud (18 U.S.C. § 1341); all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

202. The acts of racketeering were not isolated. Rather, they were related in that they had the same or similar purpose and result, participants, victims, and method of commission. Further, the acts of racketeering by the Defendants were continuous, with repeated conduct from December 2019 and continuing to present 2024. There is a continued threat of repetition of such conduct, as Defendants' unlawful schemes have become their regular manner of conducting operations.

203. The Defendants' sophistication in the fraud it conducts existed years before the Plaintiff entered into the first SBA 7a Loan in 2019. As supported by Exhibits herein, five officers

of a Newtek subsidiary acquired by Newtek in 2016 were indicted in 2019 for defrauding the SBA involving guarantees. Those officers were convicted in 2021. As further supported by the Exhibits incorporated herein, Defendants continuity of fraud strongly supports its use in multiple schemes and would suggest repetition if allowed to continue.

204. Defendants participated in the management and operation of the association-in-fact enterprise by managing, facilitating, and committing multiple acts of racketeering as described above and below.

205. The Defendants' unlawful actions proximately caused and continue to cause injuries to Plaintiff under 18 U.S.C. § 1964(c). Specifically, the Defendants' violations of these statutes resulted in Plaintiff's loss of nearly $8,000,000.00, as well as millions in lost revenues and other damages to be shown at trial. Plaintiff would not have entered into any transactions with Defendants if he had knowledge of the Defendants' systematic plan to defraud, inclusive of the fraud that existed before Plaintiff's first dealings with Defendants in 2019 and exists to the present day. When Plaintiff decided to exit Defendants' fraudulent orbit by attempting to pay off loans, Defendants delayed, prevented and refused to accept the payoffs.

206. As a result of the pattern of racketeering activity by Defendants, Plaintiff has suffered damages and injury to his business and property. Plaintiff accordingly seeks an award of three times the damages sustained to be shown at trail, and the recovery of reasonable attorneys' fees and costs already expended, and those that may be expended upon the engagement of counsel for trial, as well as any other relief as authorized by statute.

## COUNT 2: VIOLATIONS OF TITLE 18 US.C. § 1962(d) - (Civil RICO)
### (Against all Defendants)

207. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein in their entirety.

208. Each Defendant violated RICO and Plaintiff was injured as a result.

209. All Defendants violated 18 U.S.C. § 1962(d), injuring Plaintiff and giving rise to liability under 18 U.S.C. § 1964(c).

210. Under 18 U.S.C. § 1964(c):

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person who is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

211. 18 U.S.C. § 1962(d) provides as follows:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

212. Plaintiff reasserts the claims in Count I above regarding Defendants' violations of 18 U.S.C. § 1962(c). However, at a minimum, Defendants conspired to violate 18 U.S.C. § 1962(c) and thus violated 18 U.S.C. § 1962(d).

213. The United States Supreme Court has stated that "[t]here is no requirement of some overt act or specific act" in the RICO conspiracy provision, thus making this provision "even more comprehensive than the general conspiracy offense." *See Salinas v. United States*, 522 U.S. 52, 63 (1997).

214. Additionally, "a conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Id.*

215. As set forth above, the Defendants conspired to conduct or participate, directly or indirectly, in a pattern of racketeering activity.

216. Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

217. The pattern of racketeering activity which the Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific transactions as described in detail in this Complaint and the accompanying exhibits constituting mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); and attempt and conspiracy (18 U.S. Code § 1349) all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

218. Therefore, at a minimum, the Defendants conspired to violate 18 U.S.C. § 1962(c), and in doing so violated 18 U.S.C. § 1962(d). As a result of the pattern of racketeering activity by Defendants, Plaintiff has suffered damages. Plaintiff accordingly seeks an award of three times the damages sustained to be shown at trail, and the recovery of reasonable attorneys' fees and costs already expended, and those that may be expended upon engagement of counsel for trial, as well as any other relief as authorized by statute.

### COUNT 3: BREACH OF CONTRACT
**(Against all Newtek Defendants)**

219. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

220. Plaintiff and his business entered into valid and enforceable written contracts in the form of the six SBA Section 7(a) loans with Newtek initially valued at approximately $5.3 million dollars. The SBA loans provided Defendant Newtek with security interests in four properties in Texas and California against repayment by Plaintiff, with the agreement that Plaintiff could pay off the loans in full release of liens.

221. Plaintiff substantially performed on the loan contracts by, among other things, making the agreed upon loan payments on time and in the full amounts. In early November 2022, Plaintiff made a written request to Newtek for payoff amounts for certain outstanding loans, which were provided by Newtek on November 29, 2022.

222. The Newtek payoff letters are binding enforceable contracts. It is well settled that loan payoff letters are standard legal instruments for commercial reasonability in the lending industry, which includes the SBA 7a loan program, and other Government Agency backed loan programs. Payoff letters are necessary parts of the SBA Standard Operating Procedures which set forth the policies and procedures relating to SBA's loan programs and activities. A payoff letter is a commercially reasonable and customary contract that determines the final "payoff" as to leave no room for ambiguity; by providing a detailed and itemized account of a loan's outstanding balance, specifying the exact amount of funds required to satisfy a debt.

223. In commercial lending, residential lending, and sub-prime lending, a payoff letter serves as a legally binding document from a lender, acknowledging that a debt can be settled, and is the final representation by an existing lender regarding the outstanding amounts owed on a loan, including principal, interest, fees and other charges required to pay the loan in full and release any collateral.  A borrower must rely on a payoff letter in order to obtain a new lender, and a new lender will rely on the information provided in the payoff letter in making a new loan, and in confirming that the new lender's liens on the borrower's assets will have first priority at closing. The reliance on a payoff letter as a binding contract and/or written agreement is a reasonable and customary lending practice in all types of  lending including SBA loan programs. Payoff letters establish the terms of finality and extinguishment of a debt.

224. The payoff letters provided by Newtek, were contracts that established the amounts

necessary to pay off the debts and were supported by a Newtek officer's emails. Plaintiff brought the agreed upon payoff amounts to the table at closing in the form of agreements with third-party lenders with monies to be held in escrow at title companies.

a. The six SBA 7a loans and the payoff letters were valid contracts; and,

b. Plaintiff tendered performance by obtaining payoff funds through third party lenders; and,

c. Defendants breached the SBA 7a loan and payoff letter contracts by failing to accept the payoff funds and provide releases as Defendants represented in writing; and,

d. Plaintiff sustained millions of dollars as a result of Defendants' breaches.

225. Newtek and Defendants breached their contract with Plaintiff by:

a.      Materially misstating several times, the ability to provide lien releases to Plaintiff upon the satisfaction of the loans on the closing date; and,

b.      Failing to proceed with the different closings of $2,100,000.00 and $816,000.00 on the two different agreed upon dates in December 2022 and January 2023, on two different SBA 7a loans; and,

c.      Changed its own terms after a closing occurred by insisting on a 45-day waiting period to close on the loans after the announced payoff date and $816,000.00 being placed in escrow without any justification; and,

d.      Refusing to comply with the terms of the payoff letters and loan agreements despite performance by Plaintiff.

226. Newtek's breaches of the loan contracts and the payoff letters were a producing and/or proximate cause of actual damages to Plaintiff including direct, consequential, and incidental damages in an amount within the jurisdictional limits of this Court. Plaintiff is also

entitled to pre and post judgement interest, costs of court, and attorney's fees incurred to date, and those that may be necessary to engage counsel at trial, pursuant to Texas Civil Practice & Remedies Code section 38.001, et seq.

### COUNT 4: BREACH OF CONTRACT AS TO FAILED COMERICA PAYOFF
**(Against all Newtek Defendants)**

227. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

228. A valid and enforceable contract existed between Plaintiff and Newtek, under which Newtek agreed to provide loan funds and services to Plaintiff, including accurately paying off specified loans and liens. This is supported by emails, phone calls, UCC filings and other documents from December 2019 forward.

229. Plaintiff fully performed his obligations under the contract by providing the required documentation and information, as well as complying with all other terms and conditions of the contract.

230. Defendant Newtek breached the contract by failing to pay off the correct Comerica loan as directed by Plaintiff and instead inaccurately paying off the credit line.

231. As a direct and proximate result of Newtek's breach of contract, Plaintiff has suffered damages, including but not limited to the expenses and disruption of a lawsuit filed by Comerica Bank that has resulted in a litigation judgement, significant attorney's fees, and damages to Plaintiff's business which to date are $300,000.00 and continue to accrue.

### COUNT 5: PROMISSORY ESTOPPEL AS TO FAILED COMERICA PAYOFF
**(Against Newtek, Shulman and Paz)**

232. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

233. Defendants Newtek, Shulman, Paz, made clear and unambiguous promises to Plaintiff that they would pay off the correct Comerica loan.

234. Plaintiff reasonably and justifiably relied on Newtek's promise and the representations of Shulman and Paz.

235. Plaintiff detrimentally relied on Newtek's promise and the representations of Shulman and Paz by incurring additional costs, expenses, and disruptions as a result of the lawsuit filed by Comerica Bank and a litigation judgement.

236. As a direct and proximate result of Newtek's actions and Plaintiff's detrimental reliance, Plaintiff has suffered damages, that resulted in a litigation judgement, significant attorney's fees, and damages to Plaintiff which to date are $300,000.00 and continue to accrue.

### COUNT 6: FRAUD
### (Against all Defendants)

237. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

238. Defendants made a series of materially false and misleading representations to Plaintiff by:

a.    representing to Plaintiff, through Newtek's portfolio manager Arnaldo Febles, Dan Williams, Dan Eshbaugh, and Austin Briggs that it could provide a $2.975 million dollar conventional loan to fund an acquisition, the approval of which was a "sure thing" as stated by Febles, and Febles' other representations such as "You don't need to go anywhere else for that, we can do the deal for you, right here in house it's not a problem," and, "It can happen fast, maybe two three weeks, no need to take your loans away", and Williams' representations, "Don't worry, I'll see to it that it gets done."; and "we'll get something done", and,

b.    providing payoff statements for Loan # 1629263 and Loan # 235606 for a

purported closings on December 27, 2022, and December 30, 2022, for $2,100,000.00 which it had no intention of permitting to proceed and close; and,

      c.      representing to Plaintiff that the liens and on Loan # 1629263 and Loan # 235606 would be released at closing; and,

      d.      providing a payoff statement for Loan # 1629263 for a purported closing on January 4, 2023, and then January 9, 2023, for which it caused $816,000.00 to transfer to escrow, documents to be executed, title to transfer in the public records, but it had no intention of permitting to proceed and close; and,

      e.   representing to Plaintiff through Shulman, Paz, and Newtek that $255,000.00 would be provided by the first week of January 2020, and an equipment loan to Comerica would paid at a December 23, 2019 closing, but was not, and,

      f.   representing further to Plaintiff through Paz, and Newtek up until at least 2021 that an equipment loan to Comerica was paid off but in fact was not, and,

      g.  representing to Plaintiff through Shulman, and Newtek that Shulman could  facilitate a $500,000.00 non-SBA "bank loan" by submitting an SBA loan application that Shulman would later loan money from a bank acquisition that had not been approved; and,

      h. making misrepresentations to Plaintiff as detailed further detailed above and below.

      239. Newtek, Febles, Briggs, Williams, and Eshbaugh made misrepresentations related to the package of $4,250,000.00 or more in loans as detailed above and that included representations regarding the ease of approval, that this was a "sure thing", and that closing would occur rapidly within two weeks maximum and/or knew or should have known of the consequences naturally flowing from such misrepresentations, leading to financial losses for Plaintiff when the loans were not approved.  Such misrepresentations occurred through emails

and phone conversations, recorded phone conversations, including but not limited to a two-hour phone conversation on August 30, 2022, including Williams, Eshbaugh and Briggs, and a phone conversation with Willams on November 16, 2022, as well as several subsequent communications.

240. Further, Plaintiff was induced by Defendants' false and misleading representations to make expenditures and relied on such representations to his detriment. Plaintiff was induced by Defendants' false and misleading representations to bring two third-party lenders to the table and sought to close and effect a payoff of both loans on December 27, 2022, and December 30, 2022. Newtek refused to close, insisting that it could not and would not provide lien releases on the subject collateral at the time of closing. This was in direct contravention of its previous written representations in email and payoff letters to Plaintiff and others that it could and would both provide releases and the payoff letters that did not disclose or indicate that liens releases were the subject of any kind of after-closing business review.

241. Further, after funds were wired to escrow, Plaintiff continued to try and close on the payoff of Loan # 1629263 in the amount of approximately $816,000.00 but Defendants, however, reneged on their own payoff contract, and refused to provide lien releases to permit the payoff to close, even though Plaintiff had tendered ready funds capable of extinguishing the debt entirely.

242. Defendants and Newtek knowingly and intentionally made false representations and omissions to Plaintiff with the intent to induce him to proceed with conventional financing through Newtek to prevent, delay, hinder, and obstruct Plaintiff from paying off his loans.

243. Plaintiff's reliance on Defendants' misrepresentations and falsehoods directly resulted in actual damages to Plaintiff including direct, consequential, and incidental damages

in an amount within the jurisdictional limits of this Court. Such damages include, but are not limited to, general damages, lost profits or lost enterprise value, out of pocket expenses, benefit of the bargain damages, pre and post judgement interest, costs of court, and attorney's fees. Plaintiff believes his actual damages are, at a minimum, $8 million dollars, and likely, significantly higher to be shown at trail.

### COUNT 7: FRAUD
### (Fraud Within the Payoff Letters)

244. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

245. As set forth above, Newtek and Febles made numerous false representations, including fraudulent representations within the SBA 7a loan payoff letters, but not limited to, the representations all assets pledged as collateral will be released, and that a payoff would occur. Newtek and Febles made these misrepresentations to Plaintiff with actual knowledge of their falsity. Newtek and Febles created or directed the creation of the fraudulent payoff letters and used them to induce Plaintiff to believe he could payoff $2,100,000.00 on two SBA 7a loans on December 27, 2022, and December 30, 2022, and enter into another TV station backup deal as a result of Newtek's six-month decline a on the $2.975 million-dollar fraudulent loan commitment on a conventional loan they could not have made based on Newtek's own SEC filings.

246. Newtek and Febles' fraudulent payoff letters caused Plaintiff to enter into agreements and incur expenses, which were disclosed to Newtek and Febles before the payoff closing dates. Newtek and Febles knew that Plaintiff was relying on the payoff letters to secure financing and prevent further damages caused by Newtek's negligence, fraud, and reckless pattern of conduct as alleged herein.

247. Newtek and Febles caused Plaintiff to commit to acquire a $450,000.00 backup TV station with Plaintiff's remaining available funds until the closing on the two SBA loan payoffs in December 2022.  Plaintiff's reliance on the payoff letters, and those providing the payoff funds, were based on the payoff letters, with Newtek's full knowledge of Plaintiff's intent of using those funds to pay off $2,100,000.00 of SBA 7a loans, make ongoing loan payments, and payoff other SBA loans. Newtek had full knowledge that upon the payoff of the $2,100,000.00 that Plaintiff would be able to access additional capital and launch a TV network in the first week of January 2023.

248. Newtek and Febles' fraudulent payoff letters were made with the intent to, and did in fact, induce Plaintiff and others to take actions to payoff of two SBA 7a loans including the transfer of services from one state to another, and causing the transfer and movement of money, documents, and asset transfers, from one state to another.

249. When Newtek refused to accept their own payoff letters, Plaintiff contacted Defendant Sloane Chief Executive Officer, and Defendant Shulman Managing Director who were the senior-most executives at Newtek Plaintiff knew and made them aware of the issuance of the payoff letters, the representations contained therein, as well as the imminent, preventable, and foreseeable damages to Plaintiff that would result if Newtek failed to adhere to their own payoff letters.  By virtue of their positions of authority and control, Defendants Sloane and Shulman had the ability to control the outcome which resulted in a refusal to accept their own payoffs, confirming the fraudulent misrepresentations in the payoff letters at the highest level. The damages and injury to Plaintiff's property as a result of the fraudulent payoff letters was foreseeable and preventable by Newtek, and Defendants Sloane and Shulman. (See Exhibit I).

250. Due to their long business relationship on 6 different SBA 7a loans on $5,300,000.00, Plaintiff reasonably and justifiably relied on the representations and warranties contained in the payoff letters, which were known by Newtek, Febles, Sloane, Shulman and others to be fraudulent.

251. As a result of Plaintiff's reliance on the fraudulent payoff letters, Plaintiff sustained millions of dollars of losses and seeks damages in an amount to be shown at trial.

### COUNT 8: FRAUD
### (Fraudulent Concealment)

252. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

253. As set forth above, Newtek by way of email from Defendant Austin Briggs provided a commitment letter for a $2.975 million dollar loan to Plaintiff  from Newtek Conventional Lending and signed by Defendant Eshbaugh Senior Vice President Commercial Lending, Newtek Business Lending, LLC, to Plaintiff and two of his companies on July 21, 2022. During the six-month loan review process, the loan was increased to $4.25 million but at all times, Newtek knew that a conventional loan could not have been made as there was no money available to do so as per Newtek's own SEC filings.

254. According to Newtek's own public filings discovered only after the collapse of the unreasonable six-month loan process, the Newtek entity that appeared to issue the conventional loan commitment ceased making loans and doing business two years earlier. This, however, was fraudulently concealed by the Newtek enterprise and not disclosed directly to the Plaintiff. Moreover, it is contrary to the direct representations made to the Plaintiff by Febles, Briggs, Williams, Eshbaugh, and others at Newtek concerning the processing of the new loan.

255. Rather than simply provide Plaintiff a prompt 10 day or 30  day decline as is

reasonable and customary in commercial lending, or simply reveal that no conventional lending was available, Febles, Briggs, Williams, Eshbaugh, and Newtek took steps to induce Plaintiff to cease looking for other financing while concealing the fact a conventional loan could not be effectuated. This concealment was a deliberate and willful misrepresentation of information to deceive the Plaintiff. Newtek by way of Briggs knowingly and willfully provided Plaintiff a fraudulent commitment letter signed by Eshbaugh, while at all times concealing that a conventional loan could not be made. The Defendants together after a meeting of the minds conspired with an object to fraudulently conceal and prevent Plaintiff from moving his loans elsewhere and thereby benefitted though income to Defendants.

256. Over the course of six-months Newtek deprived and dissuaded Plaintiff from seeking other financing which was available at the time the fraudulent commitment letter was issued. Plaintiff was solicited by Febles and induced to pursue a conventional loan through Newtek. Plaintiff justifiably relied on the Febles' representations, as well as Briggs, Willliams, Eshbaugh and others at Newtek that the conventional loan was a sure thing and would be made. Instead, Febles, Briggs, Williams, Eshbaugh, and others at Newtek continued to conceal that no conventional lending was even available at the time Plaintiff obtained the commitment letter.

257. Had Plaintiff been provided with the actual status of the Newtek conventional loan program, Plaintiff would not have signed the commitment letter, tendered $12,000.00 for a non-existent fraudulent service, or invested $600,000.00 in acquisition fees, waited six months to obtain a funding decline through Newtek Conventional Lending or any other Newtek enterprise.

258. As a direct and/or proximate result of Defendants' false and misleading

representations and fraudulent concealment, Plaintiff suffered (and continues to suffer) damages in the form of, inter alia, the pending fraudulent foreclosures for which there is no remedy at law and for which money cannot compensate, over $600,000.00 invested in the initial TV deal, $450,000.00 in the backup TV deal, $280,000.00 lost radio signal, $218,000.00 in equipment and engineering, the loss of opportunity, loss of revenue, loss of contracts, loss of licensed content, loss of business personal, consequential damages related to additional funds borrowed to redirect operations, and the corresponding injury to Plaintiff's business, and property and seeks damages estimated at $8,000,000.00 million but likely more to be determined at trial.

### COUNT 9: FRAUD
### (Conspiracy to Commit Fraud)

259. Plaintiff repeats and realleges the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

260. In December of 2019, Newtek, including Shulman, Paz, and others at Newtek conspired to defraud Plaintiff by intentionally omitting $255,000.00 involving two SBA 7a loans and failing to pay off an equipment loan. The purpose of Defendants representation to loan $400,000.00 in working capital and payoff a $150,000.00 equipment loan was to induce Plaintiff to transfer his mortgages to Defendants' portfolio. Because Defendants Shulman, Paz, and others at Newtek did not have the funds to lend at the time, there was a meeting of the minds by said Defendants whereby they conspired to conceal the information until the actual closing date. The conspiracy resulted in the failed equipment loan payoff which has caused Plaintiff at least $300,000.00 as of the date of this action and continues to cause damages. The shorting of working capital incurred unnecessary interest payments and prevented the proper execution of the capital's use causing unnecessary payments to Newtek, prevented timely

completion of a buildout that delayed occupancy and resulted lost revenue to be shown at trial.

261. In July of 2022 and thereafter, there was an agreement between Febles, Briggs, Williams, Eshbaugh, Shulman, and others at Newtek who after a meeting of the minds, knowingly worked in unison to conspire for profit of Newtek and each other to conceal the fact that a $2,975 million-dollar conventional loan offered to Plaintiff as a sure thing could not have been effectuated according to Defendant NewtekOne, Inc.'s SEC filings. Upon information and belief, the purpose of Defendants' conspiracy and benefit to the enterprise in concealing the fraudulent loan commitment was to keep the Plaintiff's loans paying interest with Newtek as he had demonstrated a reliable payment history and was well qualified to obtain financing elsewhere.

262. In December of 2022, Newtek and all other Defendants, Sloane, Shulman, Febles, and others at Newtek agreed to and did in fact work together to prevent Plaintiff from paying off $2,100,000.00 on two SBA 7a loans, based on two payoff letters and numerous email communications provided.

263. In January of 2022, Newtek and all other Defendants including Sloane, Shulman, and Febles, agreed to and did in fact conspire to work together to prevent Plaintiff from paying off an $816,000.00 SBA 7a loan, based on a payoff letter and numerous email communications provided by Newtek. Also, in January of 2022 Newtek and all Defendants did in fact conspire to work together to cover up the payoff letters and attempt to destroy and conceal other email communications provided by the Newtek related to a government agency loan program. provided by the Newtek.

264. In February 2023, Newtek and all other Defendants, including Sloane, Shulman, Febles, and others agreed to and did in fact work together to defraud Plaintiff by manufacturing

fake loan defaults through Defendants Small Business Lending, LLC and Newtek Bank, N.A., to collect fraudulent SBA loan guarantees, despite the fact that Plaintiff attempted three times to pay off the loans.

265. Newtek and all other Defendants including Febles, Briggs, Williams, Eshbaugh, Sloane, and Shulman and others committed the overt acts described above in furtherance of their conspiracy.

266. As a result of their conduct, Plaintiff sustained losses and damages and continues to suffer injuries and seeks damages in an amount to be determined at trial.

### COUNT 10: FRAUD
### (Aiding and Abetting Fraud)

267. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

268. As set forth above, Defendants including Febles, Sloane, Shulman and others aided and abetted one another in making intentional and knowingly false representations and concerning the payoffs of $2,100,000.00 on two SBA 7a loans in December 2022, and then again in January 2023 on $816,000.00 for another SBA 7a loan. The Defendants made misrepresentations that the loans could be paid off and that the liens would be released, but at all times Defendants knew they would not allow them to be paid off. By working together to help prevent the payoff of the Plaintiff's loans, Newtek and Defendants would extort more money from Plaintiff.

269. The Newtek Defendants, including Febles, Sloane, Shulman and others engaged in this conduct with actual knowledge that the representations that they made were false and misleading. Their conduct was intended to, and did in fact, cause harm and injury to Plaintiff and his business. Each of the Defendants provided substantial assistance in furtherance of the

scheme to aid in defrauding Plaintiff, and the SBA by misrepresenting facts to the contrary.

270. The Newtek Defendants, including Febles, Sloane, Shulman and others engaged in conduct to intentionally default Plaintiff's perfect payment history to collect SBA loan guarantees, with actual knowledge that the actions taken to wrongfully manufacture fake loan defaults were false and misleading. All Defendants worked together to commit towards this wrongful action to default Plaintiff in order to Defraud the SBA.

271. As a result of this reliance, Plaintiff sustained losses and seeks rescission, restitution, and/or damages in an amount to be determined at trial.

### COUNT 11: NEGLIGENT MISREPRESENTATION
### (Against all Defendants)

272. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

273. At all relevant times, Defendant Arnaldo Febles served as the Portfolio Manager and is a corporate officer of Newtek. His role is further detailed the allegations above and below. Febles made several serious misrepresentations that caused damages to Plaintiff.

274. Defendant Scott Shulman, at the same relevant times, held the position of Managing Director for Newtek, including Newtek Bank, N.A., whereby Shulman, failed to provide correct amounts of working capital shorting Plaintiff $255,0000.00 and did not correctly pay off the Comerica loans correctly. He made misleading assurances to Plaintiff about Newtek's ability to resolve the situation through a loan from an upcoming bank acquisition that had not yet been effectuated.

275. Austin Briggs acted as an Assistant Vice President for Newtek during the relevant period. He wrongfully directed Plaintiff towards closing the $2.975 million dollar loan that could not have been made according to Newtek's own SEC filings, yet assured Plaintiff of its

certainty, which caused Plaintiff to invest substantial amounts in anticipation of the loan.

276. Daniel Paz, served as a Vice President at Newtek and demonstrated a similar negligent act of misrepresentation by failing to provide the correct amounts of working capital and correctly paying off Comerica loan. Paz made further negligent misrepresentations by stating that the Comerica loan was paid off.

277. Daniel F. Williams, an employee of Newtek's underwriting department, made false representations to Plaintiff about the approval of the approximately $4,250,000 in loans, leading to financial losses for Plaintiff when the loan was not approved.

278. Daniel Eshbaugh a Senior Vice President of Commercial Lending at Newtek also made false representations to Plaintiff about the approval of the approximately $4,250,000 in loans, leading to financial losses for Plaintiff when the loan was not approved.

279. Defendants Febles, Briggs, Williams, and Eshbaugh made misrepresentations related to the package of $4,250,000 or more in loans as detailed above and that included the misrepresentations regarding the ease of approval, that this was a "sure thing", and that closing would occur rapidly within two weeks maximum, and/or knew or should have known of the consequences naturally flowing from such misrepresentations, leading to financial losses for Plaintiff when the loans were not approved. Such misrepresentations occurred through emails and phone conversations, including but not limited to a two-hour phone conversation including Williams, Eshbaugh and Briggs as well as subsequent communications.

280. All the Defendants were made aware of the potential consequences of their actions, yet they failed to close on the refinanced properties, causing significant financial harm to Plaintiff. The Defendants' actions resulted in the unwarranted defaulting of borrowers with an unblemished payment history, despite the Plaintiff's procurement of $2,100,000.00 to

refinance out of 2 SBA 7a loans, at Newtek's own directive and suggestions. Defendants'
negligent misrepresentations actions also resulted in additional damages as detailed herein.

281. All the Defendants made misrepresentations and warranties concerning the payoffs
of $2,100,000.00 on two SBA 7a loans in December 2022, and then again in January 2023 on
$816,000.00 for another SBA 7a loan. The Newtek Defendants made misrepresentations that
the loans could be paid off and that the liens would be released, but at all times Defendants
knew they would not allow them to be paid off.

282. Plaintiff's reliance on Defendants' misrepresentations and falsehoods directly
resulted in actual damages to Plaintiff including direct, consequential, and incidental damages
in an amount within the jurisdictional limits of this Court. Such damages include, but are not
limited to, general damages, lost profits or lost enterprise value, out of pocket expenses, benefit
of the bargain damages, pre and post judgement interest, costs of court, and attorney's fees
incurred to date and any that may be necessary upon engagement of counsel at trial. Plaintiff
believes his actual damages are, at a minimum, $8,000,000.00 million, and likely, significantly
higher.

### COUNT 12: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
**(Against all Defendants)**

283. Plaintiff repeats and realleges the factual statements and allegations set forth in all
preceding paragraphs of this Complaint, as if fully set forth herein.

284. Newtek is an SBA lender that entered into several SBA loan contracts with Plaintiff,
which are governed by federal common law, and which the duty of good faith and fair dealing
applies. Each of the SBA loan agreements contains express clauses that indicate that federal
law applies because the loan was made under the United States Small Business Administration
nationwide program.

285. Courts have construed SBA loans to be governed by the implied covenant of good faith and fair dealing because federal common law recognizes such a duty. *See LPP Mortgage, Ltd. v. Moorhead*, 2008 WL 4587212, *2 (D.V.I. Oct. 8, 2008) ("Breach of the implied covenant of good faith and fair dealing may be asserted under federal contract law."); see also Restatement (Second) of Contracts § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."). Further, SBA lenders, like Newtek, must comply with SBA Loan Program Requirements, including SBA Standard Operating Procedures and standards of commercial reasonableness. See SBA Standard Operating Procedure 50.56.1 at 17 (August 1, 2023) (setting forth responsibilities of 7(A) lenders, including complying with 13 CFR § 120.10 and SOP 50.57).

286. Because federal common law supplements the procedures available for lenders at the state and local level for these SBA loans, Newtek is bound by the implied covenant of good faith and fair dealing and needed to act accordingly when determining how and when to release liens at the end of 2022, and in 2023.

287. Plaintiff has alleged facts that give rise to a claim that Defendants acted commercially unreasonably and in violation of the implied covenant of good faith and fair dealing when refusing to release subordinated cross-collateralized liens for the property Plaintiff was attempting to emergency refinance after Newtek failed to approve the conventional loan at the end of November 2022.

288. Plaintiff and Defendants entered into valid and enforceable loan agreements as outlined above.

289. Defendants owed Plaintiff the common law duty of good faith and fair dealing.

290. Defendants breached the common law duty of good faith and fair dealing by:

a. representing to Plaintiff through payoff statements and a closing date with the assurance that the subject liens would be extinguished upon payment with no intention to complete the transaction; and,

b. by changing the terms of the payoff agreements by placing an unreasonable, undisclosed, and predatory stipulation that the lien releases would be subject to a 45-day waiting period; and,

c. failing to provide lien releases as agreed to the Plaintiff at close, and/or committing to do so then changing the terms; and,

d. changing the terms again, by failing to disclose to Plaintiff that the lien releases would be subject to any type of after-closing business review; and

e. making material and fraudulent misrepresentations to Plaintiff as detailed above and throughout this Complaint.

291. Upon information and belief, Defendants' actions were performed without due regard or care for commercially reasonable business or lending practices and were done intentionally and/or with gross negligence.

292. Defendants were aware at all times that their actions would result in the loss of third-party lenders financing that would have allowed Plaintiff to fulfill the loan agreements for Loan # 235606 and held Plaintiff hostage to the agreements for Loan #1629263 when Plaintiff was willing and able to satisfy its performance requirements, causing extraordinary harm associated with Plaintiff's business and property.

293. As a result of Defendants' aforementioned acts and/or omissions, Plaintiff sustained actual damages including direct, consequential, and incidental damages in an amount within the jurisdictional limits of this Court.

## COUNT 13: BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
### (Against the Newtek Defendants)

294. Plaintiff repeats and realleges the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

295. Pleading further and in the alternative as it applies to the California law on Plaintiff's California properties, Plaintiff would assert that, the Newtek Defendants, Breached the Implied Covenant of Good Faith and Fair Dealing.

296. In California, every contract or agreement there is an implied promise of good faith and fair dealing. This implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. Good faith means honesty of purpose without any intention to mislead or to take unfair advantage of another.

297. "There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." (Comunale v. Traders & General Ins. Co.(1958) 50 Cal.2d 654, 658 [328 P.2d 198], internal citation omitted.) "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 372, 371 (1992) (internal quotation marks omitted).

298. "The covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made. The covenant thus cannot ' " 'be endowed with an existence independent of its contractual underpinnings.' " ' It cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." (Guz v. Bechtel National, Inc. (2000) 24 Cal.4th 317, 349-350 [100 Cal.Rptr.2d 352, 8 P.3d 1089], original italics, internal citations omitted.)

299. " '[B]reach of a specific provision of the contract is not . . . necessary' to a claim for breach of the implied covenant of good faith and fair dealing." (Thrifty Payless, Inc. v. The Americana at Brand, LLC (2013) 218 Cal.App.4th 1230,1244 [160 Cal.Rptr.3d 718].)
The covenant "not only imposes upon each contracting party the duty to refrain from doing

anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." Pasadena Live, LLC v. City of Pasadena, 114 Cal. App. 4th 1089, 1093 (2004) (internal quotation marks omitted).

300. "The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation. 'The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.' ... 'In essence, the covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.' " (Racine & Laramie, Ltd. v. Department of Parks & Recreation (1992) 11 Cal.App.4th 1026, 1031-1032 [14 Cal.Rptr.2d 335], internal citations omitted.)

301. "The issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily 'a question of fact unless only one inference [can] be drawn from the evidence.' " (Hicks v. E.T. Legg & Associates (2001) 89 Cal.App.4th 496, 509 [108 Cal.Rptr.2d 10], internal citation omitted.)

302. The Newtek Defendants enjoyed substantial discretionary power affecting the rights of Plaintiff during the events alleged in this Complaint. They were required to exercise such power in good faith.

303. Plaintiff would contend that under California law, the original SBA 7a loan contracts and the payoff letters on the California properties are subject to the Implied Covenant of Good Faith and Fair Dealing.

304. Plaintiff asserts, that Plaintiff and Newtek entered into valid and enforceable contracts on California real estate, which included the original SBA 7a loan agreements, and their subsequent payoff letters; and,

305. That Plaintiff did perform all, or substantially all the significant things that the contract required him to do, and all conditions required for Newtek's performance had occurred.

306. Newtek by not accepting the $2,100,000.00 SBA 7a loan payoffs in December 2022, and by not accepting $816,000.00 in January 2023, prevented Plaintiff from receiving the benefits under the contracts. By failing to release the liens and accept the funds in December 2022, and later failing to accept funds wired to escrow and changing material terms in January 2023, Newtek did not act fairly and in good faith; and as a direct and proximate cause, Plaintiff was harmed by Newtek's conduct.

307. In blatant disregard of their duty to act in good faith, the Newtek Defendants breached several contracts as demonstrated by their refusal to accept $2,100,000.00 in loan payoffs in December 2022, and $816,000.00 in January of 2023, where the Newtek Defendants engaged in such conduct to drive Plaintiff into foreclosure so that they could fraudulently acquire SBA guarantees. In the alternative, after refusing to accept the payoffs thereby breaching their duty of good faith, the Newtek Defendants attempt to acquire the Subject Properties with their significant equity at a bargain basement price. These actions are a bad faith breach of the contract between Plaintiff and the Newtek Defendants which show that they had no intention of performing the contract, consisting of the original contract, and the payoff letters, in good faith.

308. The Newtek Defendants further knowingly and willfully breached their implied covenant of good faith and fair dealing with Plaintiff when the Newtek Defendants allowed and/or directed their agent to execute the wrong named title holder on the Assignment of the Deed of Trust and Notice of Default into the public records in order to begin foreclosure on the Subject Properties. As can be demonstrated in the public records the Deed of Trust was transferred to a different title holder on January 11, 2023, and as such, the Newtek Defendants' agent is knowingly attempting to foreclose on the wrong title holder.

309. As a result of the Newtek Defendants' breaches of this covenant, Plaintiff has suffered general and special damages in an amount to be determined at trial.

### COUNT 14: CONSPIRACY
### (Against all Defendants)

310. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

311. Defendants (and possibly others), either working together as a combined group or in such combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above. By doing so, Defendants conspired to accomplish an unlawful purpose or a lawful purposed by an unlawful means. As such, Defendants conspired to commit the wrongful acts outlined in Counts III-XIII, all of which directly and/or proximately caused Plaintiff to sustain the actual and consequential damages set forth above.

312. Defendants acted in concert with each other to short Plaintiff $255,000.00 in loan proceeds and failed to pay off a $150,000.00 equipment loan to manipulate financial compliance documents for Defendants' financial gain.

313. Defendants conspired and acted in concert with each other to issue a $2.975 million-dollar fraudulent loan commitment and delayed the closing process for six months to prevent Plaintiff from paying off $5,000,000.00 in SBA 7a loans whereby Defendants' benefitted financially.

314. After Defendants' predatory six-month delay that resulted in injury to Plaintiff's business, Defendants acting together, planned and conspired to again delay and prevent Plaintiff's payoffs of two SBA 7a loans in December 2022 for $2,100,000.00, and $816,000.00 in January 2023 to extort more interest from Plaintiff whereby Defendants benefitted financially.

315. Defendants conspired and acted together to manufacture fake SBA 7a loan defaults, on Plaintiffs perfect loan payment history knowing over $2,100,000.00 was available to Plaintiff from third parties and $350,000.00 was available in escrow to pay ongoing loan payments, Defendants acting together conspired to prevent Plaintiff from accessing those funds by refusing to close on a third SBA 7a loan payoff.

316. Defendants acting in concert with each other have initiated fraudulent foreclosure proceedings in furtherance of their conspiracy to obtain fraudulent SBA loan guarantees and benefit financially therefrom at the expense of Plaintiff and the United States Taxpayers.

317. Defendants' wrongful acts constitute civil conspiracy at Texas common law.

## TOLLING OF THE STATUTES OF LIMITATION

286. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

287. **EQUITABLE ESTOPPEL.** Defendants took active steps to conceal their above wrongful actions and/or inaction. The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody and control, and await further discovery. At such time as this material information was first revealed to Plaintiff, he exercised due diligence by pursuing his claims herein. As such, and should such be necessary, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable estoppel.

288. **EQUITABLE TOLLING.** Defendants took active steps to conceal their above wrongful actions and/or inaction. The details of Defendants' efforts to conceal their unlawful conduct are in their possession, custody and control, and await further discovery. Even by exercising reasonable diligence, Plaintiff could not have discovered this information if for no other reason than he had no reason to make such inquiries at the time of some actions herein.

At such time as this material information was first revealed to Plaintiff, he exercised due diligence by pursuing his claims herein. As such, and should such be necessary, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable tolling.

## RESPONDEAT SUPERIOR AND/OR AGENCY LIABILITY

289. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

290. Each of the Newtek Defendants named in this Complaint is liable for the acts of its agents under the doctrine of respondent superior and/or under agency law for the above wrongful acts committed by their officers, directors, agents, and employees and/or agents, independent contractors, and others working at their direction during the course and scope of their employment.

291. In the alternative, Newtek Defendants, their employees, agents and ostensible agents engaged in associated enterprises, affiliated entities, joint enterprises, subsidiary entities, and/or other related ventures are liable under the direct corporate liability theory, conspiracy, and/or are liable under the theory of respondeat superior.

292. The individual Defendants named in this Complaint; to wit, the employees' wrongful conduct was committed (i) within Newtek Defendants' general authority, (ii) in furtherance of Newtek Defendants' business, and (iii) to accomplish the objective for which the employees and/or agents were hired - (i.e., defrauding the Plaintiff,  engaging in schemes to defraud others, manufacturing fraudulent loan defaults to collect SBA guarantees, extorting Plaintiff and others, by failing to accept SBA guaranteed loan payoffs etc.) of which directly and/or proximately caused (and continue to cause) Plaintiff to suffer damages to the financial benefit of Defendants.

## **RELIEF REQUESTED**

293. Plaintiff repeats, realleges and incorporates the factual statements and allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

294. **Actual Economic and Consequential Damages.** As a direct and/or proximate result of Defendants' above wrongful conduct, Plaintiff has suffered (and continues to suffer) damages in the form of, inter alia, the litigation judgement by Comerica for the failed loan payoff and the loss of bargain on Plaintiff's forced sale his Texas property and his loss of money invested in the Texas TV stations, the California TV stations, and the loss of profits and/or lost enterprise value, and those related to unfulfilled contracts and advertisements, and other injuries to his business including the loss of employees, contractors, contracts, equipment, and loss of opportunity and damage to business reputation, injury and damage to personal and business credit, and consequential damages including any others to be shown at trial, and the corresponding mental anguish suffered, which Plaintiff is also entitled to recover. All conditions precedent to Plaintiff's claims for relief have been performed and/or occurred.

295. **Punitive Damages.** Defendants' wrongful actions (and failure to disclose such wrongful actions) were committed intentionally, willfully, knowingly and/or with conscious and/or reckless disregard for Plaintiff's rights and interests. Accordingly, Plaintiff also is entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future. Punitive damages are not capped or limited because Defendants' wrongful conduct constitutes a felony under Section 32.46 and Chapter 31 of the Texas Penal Code. See Section 41.008(c) of the Texas Civil Practice and Remedies Code. All conditions precedent to Plaintiff's claim for relief have been performed and/or occurred.

296. **Treble Damages.** Plaintiff also is entitled to automatic treble damages for Defendants' knowing and intentional wrongful conduct, pursuant to 18 U.S.C. § 1964 (c). All conditions precedent to Plaintiff's claim for relief have been performed and/or occurred.

297. **Injunctive Relief.** Plaintiff also prays for a temporary restraining order, preliminary and permanent injunction as made by separate application, preventing Defendants, or anyone acting in concert with them, from foreclosing on Plaintiff's business property until a trial on the merits of the above causes and counts is tried to judgment, and from causing any of Plaintiff's property to be sold, assigned, transferred to a third-party, or taken by anyone or any entity.

298. **Attorneys' Fees, Litigation Expenses and Costs.** Plaintiff, upon any future engagement of counsel to prosecute this case at trial is entitled to recover his reasonable and necessary attorneys' fees related to any such engagement of counsel, including litigation expenses and court costs in prosecuting this action pursuant to, inter alia, 18 U.S.C. § 1964 (c), Section 38 of the Texas Civil Code.

**WHEREFORE,** Plaintiff Louie Comella respectfully requests that each of the Defendants be cited to appear and answer and, upon final trial or hearing, judgment be awarded against the Defendants, jointly and severally for:

(a) With respect to Counts I-II (violations of 18 U.S.C. § 1961, et seq.)--

(i) Threefold the actual and/or consequential damages sustained by Plaintiff along with costs of suit, attorneys' fees, litigation expenses and court costs, all pursuant to 18 U.S.C. § 1964(c), together with pre- and post-judgment interest at the highest legal rates; and

(ii) Equitable relief, as may be appropriate, pursuant to 18 U.S.C. § 1964(a), including an equitable accounting for all benefits, consideration and profits received, directly

or indirectly, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gains and profits.

 (b) With respect to Counts III-XIII:

 (i) actual and/or consequential damages to be determined by the trier of fact;

 (ii) punitive damages;

 (iii) treble damages;

 (iv) all amounts by which Defendants may have been unjustly enriched;

 (v) pre- and post-judgment interest at the highest legal rates;

 (vi) attorneys' fees and litigation expenses incurred through the trial and any appeals of this case;

 (vii) costs of suit; and

 (ix) such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all of his claims and causes of action so triable.

Respectfully submitted,

By: /s/ Louie Comella

Louie Comella – Pro Se
P.O. Box 570950
Dallas, Texas 75357
louie.comella@yahoo.co.uk
310-498-5699